No. 26-2317

IN THE

# United States Court of Appeals for the Ninth Circuit

FORD MOTOR COMPANY, A Delaware Corporation,

*Plaintiff-Appellant*,

v.

STEVE BORISLAV MIKHOV; AMY MORSE; ROGER KIRNOS,

*Defendants-Appellees*,

KNIGHT LAW GROUP, LLP, Mr. BRYAN C. ALTMAN Esquire, Attorney,
RICHARD M. WRITZ, ALTMAN LAW GROUP, DOROTHY BECERRA,
WRITZ LAW, APC,

*Defendants.*

On Appeal from the United States District Court
for the Central District of California
The Honorable Michelle Williams Court
No. 2:25-cv-04550

## OPENING BRIEF FOR APPELLANT FORD MOTOR COMPANY

Jessica L. Ellsworth
Jo-Ann Tamila Sagar
J. Andrew Mackenzie
HOGAN LOVELLS CADWALADER US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5886
jessica.ellsworth@hlc.com

August 3, 2026        *Counsel for Ford Motor Company*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel certifies the following:

Ford Motor Company has no parent corporation. As of March 31, 2025, The Vanguard Group and certain of its affiliates have disclosed that they own 10% or more of Ford's common stock.

i

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ...........................................................................v

JURISDICTIONAL STATEMENT ...................................................................1

INTRODUCTION ........................................................................................1

STATEMENT OF ISSUES ............................................................................5

STATUTORY PROVISIONS INVOLVED .........................................................5

STATEMENT OF THE CASE.........................................................................6

    A.    Defendants Engaged In A Systematic Scheme To Defraud Auto Manufacturers ........................................................6

        1.    The Enterprise's Song-Beverly Practice..............................7

        2.    The Enterprise's Fee Motion Department .............................7

        3.    The Enterprise's Extrajudicial Fraudulent Fee Demands Based on Fabricated Time Records....................10

        4.    The Enterprise's Litigation Over Its Fee Demands.............10

    B.    Ford Exposes the Enterprise's Fraud Through Audits...................11

    C.    Ford Files Suit, But The District Court Dismisses Ford's Complaint ........................................................................12

SUMMARY OF THE ARGUMENT .................................................................14

STANDARD OF REVIEW ............................................................................16

ARGUMENT .............................................................................................17

    I.    THE DISTRICT COURT ERRED IN CONCLUDING THAT *NOERR-PENNINGTON* SHIELDS DEFENDANTS FROM LIABILITY ON FORD'S RICO CLAIMS ...............................17

## TABLE OF CONTENTS—Continued

Page

A. *Noerr-Pennington* Does Not Apply To RICO Claims For Litigation Fraud And Perjury ...................................................17

    1. *Noerr-Pennington* is a rule of statutory construction that is wholly inapplicable when a statute unambiguously imposes liability for conduct that does not implicate the Petition Clause.................................................................................18

    2. The litigation misconduct unambiguously prohibited by RICO is not protected by the Petition Clause .................................................................24

B. The *Noerr-Pennington* Doctrine Is Inapplicable Under This Court's Three-Step Analysis....................................................29

    1. Ford's lawsuit does not burden Defendants' petitioning rights because there is no petitioning right to ignore the rules of litigation ...................................30

    2. The Enterprise's fraudulent scheme is not protected petitioning activity ...............................................36

    3. RICO's fraud and obstruction predicates cannot be construed to exclude the Enterprise's fraud and perjury ............................................................46

II. THE DISTRICT COURT ERRED IN HOLDING THAT FORD'S RICO CLAIMS FAILED BECAUSE FORD DID NOT PLEAD A COMMON PURPOSE....................................................53

A. Because Ford Alleges A RICO Violation By A Legal-Entity Enterprise, Knight Law Group's Enterprise Status Is Established By Its Legal Existence ................................54

B. Even If Ford Were Required To Plead A Common Purpose, The District Court's Dismissal Was Still Error Because Ford Adequately Did So.........................................58

iii

**TABLE OF CONTENTS—Continued**

                                                                    <u>Page</u>

CONCLUSION ...................................................................................................62

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

iv

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Alix v. McKinsey & Co.*,
No. 18-CV-4141 (JMF), 2023 WL 5344892 (S.D.N.Y. Aug. 18,
2023) ........................................................................................................50

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988)..................................................................................21

*B&G Foods N. Am., Inc. v. Embry*,
29 F.4th 527 (9th Cir. 2022) ...............................................................*passim*

*Bill Johnson's Restaurants, Inc. v. NLRB*,
461 U.S. 731 (1983)..................................................................................21

*Bonner v. Henderson*,
147 F.3d 457 (5th Cir. 1998) ...................................................................55

*Boyle v. United States*,
556 U.S. 938 (2009)..............................................................................55, 56

*Bunnett & Co. v. Gearheart*,
No. 17-cv-01475-RS, 2018 WL 1070298 (N.D. Cal. Feb. 27, 2018) ...............51

*C & W Constr. Co. v. Bhd. of Carpenters & Joiners of Am.*,
687 F. Supp. 1453 (D. Haw. 1988)..............................................................51

*California Motor Transport Co. v. Trucking Unlimited*,
404 U.S. 508 (1972).........................................................................20, 21, 28

*Cap. 7 Funding v. Wingfield Cap. Corp.*,
No. 17-cv-2374, 2020 WL 2836757 (E.D.N.Y. May 29, 2020) ........................56

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
208 F.3d 885 (10th Cir. 2000) (en banc) ............................................................31

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001)..................................................................................58

# TABLE OF AUTHORITIES—Continued

Page(s)

*Chevron Corp. v. Donziger*,
974 F. Supp. 2d 362 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 74 (2d Cir. 2016) ..................................................................................................50

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
690 F.2d 1240 (9th Cir. 1982) ................................................22, 23, 26

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961)...............................................................18, 19, 20

*Feld Entm't Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*,
873 F. Supp. 2d 288 (D.D.C. 2012)...................................................28

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
385 F.3d 159 (2d Cir. 2004) ...............................................................55

*Freeman v. Lasky, Haas & Cohler*,
410 F.3d 1180 (9th Cir. 2005) ............................................................33

*Gelbard v. United States*,
408 U.S. 41 (1972).............................................................................21

*Gomez v. Guthy-Renker, LLC*,
No. 14-cv-01425, 2015 WL 4270042 (C.D. Cal. July 13, 2015) .......57

*In re Arizona Theranos, Inc., Litig.*,
308 F. Supp. 3d 1026 (D. Ariz. 2018) ...............................................57

*In re Cox Enters., Inc.*,
871 F.3d 1093 (10th Cir. 2017) ..........................................................19

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*,
295 F. Supp. 3d 927 (N.D. Cal. 2018)................................................58

*Kearney v. Foley & Lardner, LLP*,
590 F.3d 638 (9th Cir. 2009) .....................................................*passim*

# TABLE OF AUTHORITIES—Continued

Page(s)

*Kottle v. Northwest Kidney Centers*,
146 F.3d 1056 (9th Cir. 1998) ..................................................40, 42, 43

*Levy v. Toyota Motor Sales, U.S.A., Inc.*,
4 Cal. App. 4th 807 (1992) ........................................................................11

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
431 F.3d 353 (9th Cir. 2005) ...............................................................*passim*

*Maldonado v. Morales*,
556 F.3d 1037 (9th Cir. 2009) ...........................................................26, 27

*Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*,
792 F.2d 341 (3d Cir. 1986) ...............................................................26

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
641 F.3d 834 (7th Cir. 2011) ...............................................................45

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
435 U.S. 679 (1978).........................................................................19, 27

*Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*,
711 F.3d 1136 (9th Cir. 2013) ...........................................................18

*Odom v. Microsoft Corp.*,
486 F.3d 541 (9th Cir. 2007) (en banc) .................................17, 27, 55

*Pepper v. Routh Crabtree, APC*,
219 P.3d 1017 (Alaska 2009) ...............................................................24

*Presley v. Torrence*,
No. 13-cv-5040, 2013 WL 3148342 (W.D. Wash. June 19, 2013)....................51

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993).........................................................................37

*Pyankovska v. Abid*,
65 F.4th 1067 (9th Cir. 2023) ...............................................................*passim*

vii

# TABLE OF AUTHORITIES—Continued

Page(s)

*San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*,
125 F.3d 1230 (9th Cir. 1997) ...................................................................26

*SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.*,
48 F.3d 39 (1st Cir. 1995)..........................................................................19

*Schrader Cellars, LLC v. Roach*,
129 F.4th 1115 (9th Cir. 2025) ..................................................................16

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985)....................................................................................58

*Shaw v. Nissan N. Am., Inc.*,
220 F. Supp. 3d 1046 (C.D. Cal. 2016) ....................................................57

*Sosa v. DIRECTV, Inc.*,
437 F.3d 923 (9th Cir. 2006) .............................................................*passim*

*Streck v. Peters*,
855 F. Supp. 1156 (D. Haw. 1994).................................................49, 50, 51

*Theofel v. Farey-Jones*,
359 F.3d 1066 (9th Cir. 2004) ............................................................*passim*

*United Mine Workers of Am. v. Pennington*,
381 U.S. 657 (1965)....................................................................................20

*United States v. Aguilar*,
515 U.S. 593 (1995)....................................................................................25

*United States v. Alvarez*,
567 U.S. 709 (2012)....................................................................................26

*United States v. Caron*,
551 F. Supp. 662 (E.D. Va. 1982), *aff'd*, 722 F.2d 739 (4th Cir.
1983) ...........................................................................................................50

*United States v. Eisen*,
974 F.2d 246 (2d Cir. 1992) .......................................................................25

# TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Gonzalez-Mares*,
  752 F.2d 1485 (9th Cir. 1985) ....................................................................50, 51

*United States v. Griffin*,
  660 F.2d 996 (4th Cir. 1981) ......................................................................55, 56

*United States v. Koziol*,
  993 F.3d 1160 (9th Cir. 2021) ..........................................................................34

*United States v. Maloney*,
  71 F.3d 645 (7th Cir. 1995) ........................................................................25, 26

*United States v. Mayer*,
  775 F.2d 1387 (9th Cir. 1985) ..........................................................................49

*United States v. Louderman*,
  576 F.2d 1383 (9th Cir. 1978) ..........................................................................47

*United States v. Philip Morris USA Inc.*,
  566 F.3d 1095 (D.C. Cir. 2009)....................................................................18, 22

*United States v. Savoy*,
  38 F. Supp. 2d 406 (D. Md. 1998)....................................................................50

*United States v. Turkette*,
  452 U.S. 576 (1981)..............................................................................54, 55, 56

*U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*,
  931 F.3d 966 (9th Cir. 2019) ............................................................................16

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades
  Council, AFL-CIO*,
  31 F.3d 800 (9th Cir. 1994) ........................................................................40, 41

*Walter v. Drayson*,
  538 F.3d 1244 (9th Cir. 2008) ..........................................................................17

*Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*,
  728 F.3d 354 (4th Cir. 2013) ............................................................................17

# TABLE OF AUTHORITIES—Continued

Page(s)

*Yatvin v. Madison Metro. Sch. Dist.*,
840 F.2d 412 (7th Cir. 1988) ..................................................................21, 34

*York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc.*,
65 F.4th 459 (9th Cir. 2023) ................................................................16

STATUTES:

18 U.S.C. § 1341 ..................................................................................25, 47

18 U.S.C. § 1343 ..................................................................................25, 47

18 U.S.C. § 1503 ..................................................................................*passim*

18 U.S.C. § 1512 ..........................................................................................25

18 U.S.C. § 1513 ..........................................................................................25

18 U.S.C. § 1515(a)(1) ..................................................................................25

18 U.S.C. § 1621 ..........................................................................................32

18 U.S.C. § 1621(2) ......................................................................................49

18 U.S.C. § 1961(1)(B) ....................................................................25, 47, 48

18 U.S.C. § 1961(1)(D) ................................................................................25

18 U.S.C. § 1961(4) ......................................................................................54

28 U.S.C. § 1291 ............................................................................................1

28 U.S.C. § 1331 ............................................................................................1

Cal. Civ. Code § 1793.2 ................................................................................7

Cal. Civ. Code § 1794(d) ............................................................2, 7, 8, 36

Cal. Penal Code § 118 ................................................................................32

x

# TABLE OF AUTHORITIES—Continued

Page(s)

**RULES:**

Cal. R. Pro. Conduct 3.3(a)(1) ...............................................................32

Cal. R. Pro. Conduct 3.3(a)(3) ...............................................................32

**OTHER AUTHORITY:**

Black's Law Dictionary (6th ed. 1990) ...................................................55

xi

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over Ford Motor Company's complaint under 28 U.S.C. § 1331 because Ford asserted federal claims arising under the laws of the United States. 2-ER-188. The court dismissed Ford's operative complaint and entered judgment against Ford on March 10, 2026. 1-ER-2-29. Ford filed a timely notice of appeal on April 9, 2026. 4-ER-903-904. This Court has jurisdiction under 28 U.S.C. § 1291.

## INTRODUCTION

Ford has paid over $100 million in attorney fees to an entity called Knight Law Group LLP under the fee-shifting provision in California's Song-Beverly Consumer Warranty Act. Knight Law Group, formed in 2012, has intensely marketed itself as specializing in Song-Beverly litigation. Its fee demands seemed exorbitant, but purported to be supported by declarations attaching accurate, contemporaneously recorded timesheets. Ford investigated by compiling fee demands it had received and publicly available information from other cases, and the conclusion was stark and unmistakable: The evidence supporting those fee requests was made up. Ford filed this suit to recover monies it was defrauded into paying on fee requests supported by perjured declarations and fabricated time sheets.

Tens of thousands of Song-Beverly cases are now filed in California each year, and Ford, like all automotive manufacturers, has felt that increase. Song-

1

Beverly creates several options for consumers to remedy disputes over vehicles under warranty that manufacturers cannot timely repair—one of which is a cause of action accompanied by a fee-shifting provision. If plaintiffs prevail, their attorneys can recover fees and expenses from the defendant car manufacturer "based on actual time expended" that was "reasonably incurred." Cal. Civ. Code § 1794(d).

Knight Law Group's fee demands often exceeded the value of the underlying claim by a factor of ten, but for several years, Ford paid these exorbitant fees because it had no way to know they were after-the-fact fabrications rather than the contemporaneously recorded time entries they purported to be. Over time, Ford became suspicious and began compiling fee demands from the cases against Ford and other publicly filed fee demands.

Ford's extensive work revealed irregularities—and impossibilities—in Knight Law Group's claims. Individual attorneys there often worked more than 24 billable hours in a day. For example, one attorney worked 57.5 hours for one day and 31.3 for another. That same attorney averaged 16.5 hours daily (including weekends) for months. Another biller claimed to have attended, in person, multiple case proceedings in different locations on the same day. For example, an attorney billed 16 hours for attending a trial in Alameda County Superior Court while, on the same day, billing 13 hours for attending a trial 400 miles away in Los Angeles

2

County Superior Court. Ford realized it had been defrauded out of millions of dollars in fees bearing no relation to time actually worked by Knight Law Group attorneys.

Ford sued several individuals who play leadership roles at Knight Law Group under the Racketeer Influenced and Corrupt Organizations Act (RICO), which creates a civil cause of action for victims of racketeering activity, including fraud and obstruction of justice. Ford alleged that Defendants violated RICO by participating in the conduct of Knight Law Group as a legal-entity enterprise (hereinafter, "the Enterprise") to defraud Ford and other auto manufacturers.

The District Court dismissed the case on the pleadings, holding Ford's claims barred by the *Noerr-Pennington* doctrine. That judge-made doctrine originated in antitrust law to resolve an ambiguity about whether the Sherman Act should be interpreted to impose liability for petitioning the government to enact laws that would harm a competitor; *Noerr-Pennington* prohibits Sherman Act liability for such petitioning activity. While the doctrine has been extended beyond lobbying and outside the antitrust context, the doctrine at its core is a rule of construction for resolving statutory ambiguity. When a statute is ambiguous as to whether it contemplates liability for conduct protected by the First Amendment's Petition Clause, the doctrine immunizes a defendant from liability unless an exception applies.

RICO has no such ambiguity for courts to resolve. Despite unambiguous language covering the predicate acts of perjury and fraud, the District Court reached the startling conclusion that any activities touching upon the judiciary—including perjured declarations and fraudulent billing statements—are protected by *Noerr-Pennington*. That decision stretches this judge-made doctrine beyond its breaking point. The Petition Clause protects a party's right to petition the government; it does not provide a right to lie under oath in court or to defraud an opposing party who *also* has petitioning rights to a fair and effective judicial forum. Congress acted well within constitutional bounds when it drafted RICO and the fraud and perjury statutes to impose liability for such conduct. The District Court lacked the authority to nullify that statutory text. This Court should reverse the District Court's overbroad misapplication of *Noerr-Pennington*.

The District Court made a second critical error when it concluded Ford failed to allege Defendants shared a common purpose and thus inadequately pleaded the "enterprise" element of its RICO claims. Common purpose is an element of an *association-in-fact* enterprise, which is an informal association of individuals alleged to constitute an enterprise based on their common purpose. But Ford alleged a *legal-entity* enterprise. A legal-entity enterprise is established by its formal legal status, and no further showing of common purpose is required.

4

These errors led the District Court to dismiss both Ford's substantive RICO violation and its RICO conspiracy claim. This Court should reverse and reinstate Ford's claims.

## STATEMENT OF ISSUES

1. Whether *Noerr-Pennington* is inapplicable here because RICO unambiguously applies to litigation misconduct, which is not protected by the Petition Clause.

2. Whether *Noerr-Pennington* is inapplicable here because a party's petitioning rights are not burdened by a lawsuit enforcing rules applicable to all litigants, such as prohibitions against perjury and fraud.

3. Whether *Noerr-Pennington* is inapplicable here because the doctrine does not immunize sham fee petitions that are based on fraud and perjury and constitute objectively baseless fee demands.

4. Whether *Noerr-Pennington* is inapplicable here because the RICO predicates on which Ford relies—mail and wire fraud and perjury—plainly encompass fraudulent settlement demands and perjured fee-motion declarations.

5. Whether Ford adequately alleged the enterprise element of a RICO violation.

## STATUTORY PROVISIONS INVOLVED

Relevant statutory provisions are reprinted in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Defendants Engaged In A Systematic Scheme To Defraud Auto Manufacturers.

Defendants Steve Mikhov, Roger Kirnos, and Amy Morse are licensed attorneys with legal and ethical duties of truthfulness and candor to the courts and to their clients. Mikhov is the former managing partner of the Enterprise, who continues to exercise considerable influence on its affairs through a consulting firm run out of Puerto Rico. 2-ER-185-187. Kirnos is the firm's current managing partner. 2-ER-187; *see* 2-ER-178. And Morse is a partner responsible for supervising the litigation department. 2-ER-187.

Mikhov, Kirnos, and Morse participated in the Enterprise to defraud auto manufacturers like Ford out of millions of dollars in supposed legal fees. They run the Enterprise on a litigation-mill model, meaning it files many more cases than it can expect to win in hopes that some will pan out. Rather than record attorney time on all cases contemporaneously, Enterprise attorneys relied on the firm's Fee Motion Department to generate false billing records for successful cases months or years after the fact. These falsified records were based on made-up work and impossible working hours. Enterprise attorneys would then use the fraudulent billing records to collect fabricated attorney fees from auto manufacturers. Enterprise attorneys would demand payment directly from the manufacturer, which manufacturers, including Ford, often paid. If the manufacturer objected to the fee demand, the

6

Enterprise would file a fee motion in court. Ford was defrauded out of money both ways.

### 1. The Enterprise's Song-Beverly Practice

The Enterprise specializes in litigation under the Song-Beverly Consumer Warranty Act. 2-ER-178, 2-ER-185-187. Song-Beverly requires car manufacturers to replace or refund motor vehicles under warranty that cannot be timely repaired. Cal. Civ. Code § 1793.2. It has a fee-shifting provision: prevailing plaintiffs can recover "attorney's fees based on actual time expended, determined by the court to have been reasonably incurred by the buyer in connection with" an action under the statute. *Id*. § 1794(d).

Since 2015, the Enterprise has filed over 10,000 Song-Beverly cases against Ford and other manufacturers, including GM, Fiat Chrysler Automobiles/FCA, Volkswagen/Audi, and BMW. 2-ER-205. From these cases, the Enterprise has netted huge legal fees. From 2021 through 2024 alone, the Enterprise has obtained approximately $35 million in fee awards solely from Ford. *Id*.

### 2. The Enterprise's Fee Motion Department

Enterprise attorneys did not record their time as they worked. 2-ER-180. Instead, the Enterprise used its Fee Motion Department to fabricate billing records months or years after the fact. 2-ER-184, 2-ER-191. The Fee Motion Department employed ten or more people in a multi-layered system of drafters, reviewers, and

finalizers. 2-ER-187-188, 2-ER-192-193. Together, they faked billing entries "without confirming their accuracy with the lawyers whose time [they were] supposedly entering," 2-ER-192-193, and "without ascertaining how much time [an attorney] actually spent on that task or whether he performed that task at all," 2-ER-200.

The Fee Motion Department was not merely padding "actual time expended." Cal. Civ. Code § 1794(d). It forged fictional hours—corresponding to hundreds of thousands of dollars in demanded fees—without regard to whether the listed attorney spent a single minute on the reported task. 2-ER-214-215. Morse, for instance, testified under oath that she never communicated with clients between 2016 and 2024. 2-ER-197. Yet Ford has compiled over 4,600 time entries the Fee Motion Department generated during that period in Morse's name with the description "Communicate with Client." *Id.* That number comes from Ford's review of billing records for only 11-12% of the cases for which the Enterprise received fees during the relevant period, so the true number is undoubtedly magnitudes larger. The 4,600 fake entries alone add up to a payment demand for 1,150 hours of work Morse has admitted she never did. *Id.*

The Fee Motion Department's bogus billing records for Morse test—and often exceed—the limits of time. Ford compiled invoices that collectively have Morse billing *more than 24 hours a day* on 34 separate occasions, and *between 20 and 23.9*

8

*hours a day* on 38 other occasions. 2-ER-196. During one three-month period, she averaged *483.7 hours each month. Id.* The Enterprise demanded payment for an astronomical 3,106.45 hours worked by Morse in 2016, and 3,975.40 hours worked by her in 2017—and, remember, these numbers come from just the 11-12% of Enterprise billings Ford has obtained; the extrapolated figure is 33,000 hours for 2017. 2-ER-196-197. Yet Morse testified that from 2016 on, she spent 70-80% of her time on non-billable administrative and supervisory work, while working 60 hours per week—which means she spent, at most, 18 hours per week on billable work *across the entire Enterprise litigation portfolio. Id.*

These examples are just the tip of the iceberg. To reiterate—Ford has only 11-12% of the Enterprise's billing records for the relevant period. 2-ER-194-195. And Morse's extravagant billing represents a narrow subset of the larger fraud Ford expects to uncover in discovery. Ford already knows another Enterprise attorney billed more than 24 hours per day on at least six days in 2017. 2-ER-198. And in just the 11-12% of cases for which Ford has invoices, Mikhov logged 1,350 hours in 2016 and 1,799 hours in 2017. 2-ER-200. If these records are representative of the remaining 88-89% of Enterprise invoices Ford has yet to see, the Enterprise's generation of false billing records add up to over 10,000 hours a year for Mikhov.

9

### 3. The Enterprise's Extrajudicial Fraudulent Fee Demands Based on Fabricated Time Records

Enterprise attorneys used the Fee Motion Department's fraudulent billing records to demand fees from auto manufacturers. 2-ER-181-182, 2-ER-209-213. These demands, which were accompanied by fee statements fraudulently reflecting attorney time made up out of whole cloth, often exceeded the amount in dispute by a factor of 10. 2-ER-181-182, 2-ER-202.

Ford often paid the Enterprise's demanded fees. 2-ER-221 (citing 2-ER-255-271). The consequences of refusing were steep: the Enterprise threatened that unless Ford paid, the Enterprise would seek even higher fees. 2-ER-184. Ford also knew the Enterprise would demand compensation from Ford for time spent litigating any fee motion. *Id*. And because the Enterprise often waited a year or more after a case concluded to demand fees based on fraudulent time records, discovery was long closed and Ford had no opportunity to challenge the basis for the demands. *Id*. When Ford settled based on these demands, there was no court involvement at all. *Id*.

### 4. The Enterprise's Litigation Over Its Fee Demands

If a manufacturer refused a fee demand, Mikhov or Kirnos would file a fee motion in court. *See* 2-ER-193-194, 2-ER-201-203, 2-ER-216. Counsel seeking fees under Song-Beverly's fee-shifting provision must submit a fee application supported by competent evidence, including timesheets and billing records reflecting

10

work actually performed. 2-ER-188-189. The fee applicant bears the burden of showing the requested fees are reasonable. *Id.*; *see also Levy v. Toyota Motor Sales, U.S.A., Inc.*, 4 Cal. App. 4th 807, 816 (1992).

The Enterprise's fee motions were supported by sworn declarations, which attached fabricated time records and included the perjurious statement of an Enterprise attorney (Mikhov or Kirnos) that "[a]ll time billing entries were completed contemporaneously with each dated entry or near in time to the work performed" and that he "personally reviewed the billing entries to ensure that they appropriately reflect the time expended." 2-ER-189, 2-ER-206-207; *see also* 2-ER-207-213. These declarations were filed in both state and federal court. *See* 2-ER-272-351, 3-ER-354-474, 3-ER-509-636, 4-ER-639-902. When courts granted these fee demands, auto manufacturers paid the Enterprise. 2-ER-221.

## B. Ford Exposes the Enterprise's Fraud Through Audits.

The Enterprise spread its fraudulent billing across thousands of cases. The time records in any given case did not show attorneys billing over 24 hours a day or being in two places at once, so it was not until Ford began collecting and compiling data from time sheets across all the Enterprise cases for which it could locate fee requests that the fraud was detectable. Ford also obtained deposition testimony Enterprise employees gave under oath in other litigation, which further revealed the fraud. 2-ER-179.

11

All told, Ford has been able to review only approximately 11-12% of cases handled by the Enterprise between 2013 and 2024. 2-ER-179-180, 2-ER-184, 2-ER-194-195, 2-ER-214. And yet, the compilation from this subset reveals substantial fraud. For Morse alone, Ford identified 8,936 specific fraudulent entries in 1,152 separate cases totaling $865,301 in fees attributable to work Morse admitted under oath she never performed. 2-ER-179. Ford is continuing to audit the records it has obtained, at the cost of many millions of dollars, trying to uncover the extent of the fraud in that subset of records. 2-ER-214.

### C. Ford Files Suit, But The District Court Dismisses Ford's Complaint.

Ford filed suit in May 2025, alleging RICO and RICO conspiracy claims. *See* D. Ct. Dkt. 1. The Enterprise almost immediately began withdrawing requests for payment for time entries purportedly made by Morse and other Enterprise attorneys. 2-ER-205-206. For example, after reviewing the initial complaint in this action, the Enterprise submitted a "supplemental" billing invoice removing Morse's time from billing records it had just submitted in *Solisperez v. Ford*, Los Angeles Superior Court Case No. 23PSCV01411. *Id.*

Ford amended its complaint. D. Ct. Dkt. 83. Defendants refused to turn over any billing-record information to Ford, *see* D. Ct. Dkt. 127-5, so Ford began subpoenaing law firms that had previously sued the Enterprise for violating contractual agreements related to co-counseled Song-Beverly cases. Ford received

12

in response deposition testimony from those cases about the Enterprise's billing practices. *See* D. Ct. Dkts. 127-3, 127-4. In November 2025, the District Court dismissed Ford's amended complaint with leave to amend and stayed further discovery. 1-ER-30-62.

Ford filed its Second Amended Complaint in January 2026, alleging RICO and RICO conspiracy claims against Mikhov, Kirnos, and Morse based on their participation in Knight Law Group, LLP as a legal-entity enterprise to defraud auto manufacturers through predicate acts of mail and wire fraud and obstruction of justice. 2-ER-220-222. The court dismissed the Second Amended Complaint for two reasons, incorporating much of the reasoning of its first dismissal order. 1-ER-12-28.

First, the court held that *Noerr-Pennington* bars Ford's claims. According to the court, *Noerr-Pennington* applies for three reasons: (1) allowing a lawsuit to proceed that seeks to impose liability for fabricated evidence and perjured declarations would burden petitioning rights because those materials were submitted to courts, 1-ER-14-16; (2) Defendants' misconduct falls outside *Noerr-Pennington*'s sham exception because their fraud and perjury did not deprive the entirety of the Enterprise's Song-Beverly litigation of legitimacy, 1-ER-17-20; and (3) RICO can be construed to not impose liability for the misconduct alleged, 1-ER-21. Each of

13

these determinations was necessary to the court's conclusion that *Noerr-Pennington* bars Ford's suit.

Second, the court held that Ford failed to demonstrate an association-in-fact enterprise because the alleged "pattern of fraud" could have resulted from unilateral action rather than a common purpose to engage in racketeering. 1-ER-23-26.

Finally, the District Court dismissed Ford's RICO conspiracy claim for the same reasons it dismissed Ford's claim of a substantive RICO violation. 1-ER-28.

Ford timely appealed. 4-ER-903-904.

## SUMMARY OF THE ARGUMENT

**IA.** *Noerr-Pennington* does not bar Ford's suit. For this judge-made doctrine to apply, a court must first determine that it is unclear how close to the line of the First Amendment Congress intended to legislate; the doctrine narrows the reach of ambiguous statutory text to provide a buffer around constitutionally protected petitioning activity that courts assume Congress would have intended to exclude from the statute's scope. But Congress left no such uncertainty when it enacted RICO. That statute unambiguously imposes liability for litigation misconduct like fraud and perjury—conduct that unambiguously falls outside the Petition Clause's protection. There is no work for *Noerr-Pennington* to do in this case, and no need for this Court to engage in the three-part test it applies to guide its consideration of closer cases.

14

**IB.** In any event, application of this Court's three-part *Noerr-Pennington* test shows the trial court erred in dismissing Ford's suit. *First*, allowing this suit to proceed would not burden Defendants' ability to bring future Song-Beverly claims or seek legitimate fees in those cases. This suit challenges Defendants' violation of rules applicable to all litigants: the prohibitions against perjury and the submission of fabricated evidence in judicial proceedings. The Petition Clause does not include a right to violate the rules that make effective litigation petitioning possible.

*Second*, Ford's suit does not target protected petitioning activity because the Petition Clause does not protect sham litigation. This Court recognizes three sham exceptions, all of which apply. The first removes from *Noerr-Pennington* objectively baseless litigation conduct intended to perpetrate fraud. Check. The second applies when a series of lawsuits are filed to utilize the court system to commit fraud rather than because of the underlying merit of those suits. Check. The third applies to misrepresentations to a court that deprive litigation of its legitimacy by, for example, inducing an inflated award. Check. Defendants' conduct was sham litigation unprotected by the Petition Clause.

*Third*, the applicable RICO predicates cannot be construed to avoid the conduct alleged. The RICO predicates on which Ford relies are mail and wire fraud and obstruction of justice via perjury. The fraudulent evidence and perjured declarations alleged by Ford fall within the heartland of both.

15

**II.** The District Court separately erred in holding that Ford failed to allege the common purpose element of an association-in-fact enterprise. Ford's RICO claim is premised on a legal-entity enterprise, which is distinct from an association-in-fact enterprise and requires no common-purpose allegations. In any event, Ford did offer common purpose allegations.[1]

## STANDARD OF REVIEW

The dismissal of Ford's complaint based on *Noerr-Pennington* is reviewed de novo. *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 534 (9th Cir. 2022).

Because *Noerr-Pennington* is an affirmative defense, dismissal based on this doctrine is improper unless the defendant can show, based on "the face of the complaint," that the doctrine applies to defeat the plaintiff's claim. *U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 975 (9th Cir. 2019); *accord Schrader Cellars, LLC v. Roach*, 129 F.4th 1115, 1125 n.12 (9th Cir. 2025) (*Noerr-Pennington* "does not provide immunity from suit" on an otherwise cognizable claim but rather is an "affirmative defense" conferring immunity from liability); *York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 466 (9th Cir. 2023) ("ordinarily, affirmative defenses may not be raised on a motion to

---

[1] Because the court dismissed Ford's RICO conspiracy claim based solely on its dismissal of Ford's substantive RICO violation, 1-ER-28, reversal on the dismissal of Ford's substantive RICO claim would also mean reversal on the dismissal of Ford's RICO conspiracy claim.

16

dismiss" (citation omitted)); *Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 359-360 (4th Cir. 2013) (holding claims cannot be dismissed pursuant to *Noerr-Pennington* unless the defense clearly bars the claims based on the face of the complaint).

The dismissal of Ford's complaint for failure to plead a substantive RICO violation is likewise reviewed de novo. *Odom v. Microsoft Corp.*, 486 F.3d 541, 545 (9th Cir. 2007) (en banc). "In addition, [the Court is] mindful of [the] enjoinder not to be stingy in interpreting and applying RICO." *Walter v. Drayson*, 538 F.3d 1244, 1247 (9th Cir. 2008) (citing *Odom*, 486 F.3d at 547). "As Congress admonished and as the [Supreme] Court repeated … RICO should be liberally construed to effectuate its remedial purposes." *Odom*, 486 F.3d at 547 (internal quotation marks and citation omitted).

## ARGUMENT

I. **THE DISTRICT COURT ERRED IN CONCLUDING THAT *NOERR-PENNINGTON* SHIELDS DEFENDANTS FROM LIABILITY ON FORD'S RICO CLAIMS.**

A. ***Noerr-Pennington* Does Not Apply To RICO Claims For Litigation Fraud And Perjury.**

Defendants will doubtless ask this Court to jump straight into its three-step *Noerr-Pennington* test, where Defendants think they have a chance of winning in the weeds. As discussed below, they are wrong. *See infra* pp. 29-52. Defendants fail every step of that analysis. But the Court need not get there because, here, there

17

is no "statutory interpretation that could implicate the rights protected by the Petition Clause." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 931 (9th Cir. 2006). Any "attempt to invoke *Noerr-Pennington* as protection" against a RICO claim for "false or misleading statements" fails at the threshold because "neither the *Noerr-Pennington* doctrine nor the First Amendment more generally protects petitions predicated on fraud or deliberate misrepresentation." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1123 (D.C. Cir. 2009) (per curiam) (citation and alteration omitted). Where, as here, "statements are deliberately false or misleading, *Noerr-Pennington* does not apply." *Id*. at 1124. Full stop. Defendants cannot satisfy that "step zero" of the three-step test: RICO liability for litigation misconduct like Defendants' fraud and perjury raises no substantial constitutional question.

**1. *Noerr-Pennington* is a rule of statutory construction that is wholly inapplicable when a statute unambiguously imposes liability for conduct that does not implicate the Petition Clause.**

"[T]he *Noerr-Pennington* doctrine is a rule of construction." *Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 711 F.3d 1136, 1139 (9th Cir. 2013). It derives from the "generic" interpretive principle that courts should not " 'lightly impute to Congress an intent to invade … freedoms' protected by the Petition Clause." *Sosa*, 437 F.3d at 931 (quoting *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961)). It is thus "a specific application of … the canon of constitutional avoidance." *Id*. at 931 n.5. But that canon—and by extension *Noerr-*

18

*Pennington*—applies *only if* there is a constitutional concern to avoid because the law at issue is unclear about whether Congress intended to bring conduct that might implicate the Petition Clause within the statute's scope.

a. The antitrust context in which *Noerr-Pennington* first arose is illustrative of the doctrine's proper application. The wording of the Sherman Act is exceptionally broad, which has prompted a slew of judge-made rules to cabin its scope. *See e.g.*, *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 687-688 (1978) ("[T]he Sherman Act … cannot mean what it says," because "read literally," it "would outlaw the entire body of private contract law," a result that "Congress … did not intend."). "Thus, antitrust law's various doctrines are almost entirely judge-made; courts have created these doctrines based on their own interpretations of the Sherman Act's statutory language and background." *In re Cox Enters., Inc.*, 871 F.3d 1093, 1097 (10th Cir. 2017); *see also, e.g.*, *SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.*, 48 F.3d 39, 43 (1st Cir. 1995) ("[A]ntitrust law is largely the handiwork of federal judges and antitrust enforcers[.]").

One of those judge-made rules is the *Noerr-Pennington* doctrine. Faced with Congress's use of broad language in the Sherman Act that could be read to cover everyday political advocacy, the Supreme Court invoked a narrowing construction to avoid that result. The seminal case is *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961). *Noerr* involved railroad

19

companies' efforts to influence legislation entrenching their monopoly power. When truckers sued for antitrust violations, the Supreme Court held the antitrust laws did not reach this conduct, explaining that "[t]he right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Noerr*, 365 U.S. at 138.

The Court later expanded the doctrine beyond legislative lobbying. In *United Mine Workers of America v. Pennington*, the Court applied *Noerr* to lobbying directed at the executive branch. 381 U.S. 657, 670 (1965). Subsequently, in *California Motor Transport Co. v. Trucking Unlimited*, the Court further extended the doctrine to administrative agencies and courts. 404 U.S. 508, 510 (1972).

b. At the same time, however, the Court also recognized that the Petition Clause—and, by extension, the *Noerr-Pennington* narrowing construction—poses no barrier to "sanctions" for "unethical conduct," especially "in the setting of the adjudicatory process." *California Motor*, 404 U.S. at 512. The Court endorsed liability for "[p]erjury of witnesses," "[u]se of a patent obtained by fraud," "[c]onspiracy with a licensing authority," and "bribery of a public purchasing agent," even where those actions—if lawful—would have been fairly characterized as petitioning activity. *Id.* at 512-513 (collecting cases). And the Court stressed that "[t]here are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes" and are therefore unprotected by

20

*Noerr-Pennington.* *Id.* at 513. The Court later reaffirmed that notwithstanding *Noerr-Pennington*, "unethical and deceptive practices can constitute abuses of administrative or judicial processes that may result in antitrust violations." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988).

That is because Petition Clause rights exist only "within the limits, of course, of [the administrative and judicial bodies'] prescribed procedures." *California Motor*, 404 U.S. at 515. Where a defendant engaged in criminal conduct or violated "prescribed procedures," the Petition Clause cannot create immunity, and *Noerr-Pennington*'s constitutional-avoidance doctrine has no work to do. "[N]ot every legal gesture—not every legal pleading—is protected by the First Amendment." *Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412, 419 (7th Cir. 1988) (Posner, J.). "Remedies against baseless litigation do not violate the First Amendment's right to petition," *id.* (citing *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743 (1983)), nor do statutes that "ensure that the courts do not become partners to illegal conduct," *Gelbard v. United States*, 408 U.S. 41, 51 (1972). "First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute." *California Motor*, 404 U.S. at 514.

c. Applying these principles, this Court has recognized that there is a threshold step in *Noerr-Pennington* cases. Because *Noerr-Pennington* applies only when a broadly-worded, ambiguous statute could (but need not) be construed to prohibit

21

petitioning conduct, at this threshold stage, the Court first considers whether a constitutional question of statutory interpretation is presented. If yes, the Court proceeds to consider application of *Noerr-Pennington* immunity using a three-step test. If no, the Court allows the suit to proceed. For example, in *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, this Court held that a RICO suit predicated on fraudulent discovery should proceed, observing that "falsification, destruction, and misrepresentation of evidence" is not "entitled to … immunity." 431 F.3d 353, 364-365 (9th Cir. 2005). The Court had no need to conduct a *Noerr-Pennington* analysis. Other courts have taken a similar approach. *See, e.g.*, *Philip Morris USA Inc.*, 566 F.3d at 1123 (holding that any "attempt to invoke *Noerr-Pennington* as protection" against a RICO claim for "false or misleading statements" fails at the threshold because "neither the *Noerr-Pennington* doctrine nor the First Amendment more generally protects petitions predicated on fraud or deliberate misrepresentation" (citation and alteration omitted)).

In these cases, courts have judged it obvious—as a threshold matter—that constitutional protections did not apply. The Sherman Act is ambiguous. But Congress was clear in other statutes about what is prohibited. And because "there is no constitutional value in false statements of fact," Congress can lawfully prohibit such statements. *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1261 (9th Cir. 1982) (citation omitted). After all, "[c]ourts uniformly

22

punish perjury" and federal law "imposes criminal penalties for knowingly and willfully concealing or misrepresenting material facts before any department or agency of the United States." *Id*. None of this runs afoul of the First Amendment.

This Court followed these principles again in its recent decision in *Pyankovska v. Abid*, 65 F.4th 1067 (9th Cir. 2023), albeit within the framework of the three-part test discussed below. *See infra* pp. 30-36. *Pyankovska* arose from a child custody dispute in which the plaintiff's ex-husband attached transcripts of secretly recorded conversations to a custody motion. 65 F.4th at 1071. The plaintiff then sued her ex-husband and his attorney in federal court for violating the Federal Wiretap Act. *Id*. at 1073. The district court dismissed on *Noerr-Pennington* grounds, but this Court reversed. *Id*. at 1076.

As the Court explained, the Wiretap Act did not raise Petition Clause concerns because "complying with laws and rules of general application to litigants in court imposes no legally cognizable burden on … conduct that is protected by the First Amendment's Petition Clause." *Id*. at 1078 n.5. The ex-husband's attorney "was free to file and argue the custody motion—*i.e.*, to petition—but he was not free to support that motion with illegal evidence." *Id*. at 1077.

Holding an attorney accountable for violating the Wiretap Act's restriction on the kind of evidence that can be received at trial is no different than holding an attorney accountable for violating "the Federal Rules of Civil Procedure and

23

Evidence, page limitations, limitations on oral argument time, sanctions under Rule 11 of the Federal Rules of Civil Procedure, as well as rulings by the court excluding testimony before and during trial." *Pyankovska*, 65 F.4th at 1077. "In other words, because [the defendant] had no petitioning 'right' to use the transcripts in the first place, requiring him to face the consequences specified by Congress for those who violated the law is not a cognizable 'burden' on any conduct he was lawfully entitled to participate in." *Id.* at 1078; *accord Pepper v. Routh Crabtree, APC*, 219 P.3d 1017, 1023 (Alaska 2009) (rejecting *Noerr-Pennington* immunity where the claims "appear to burden [the defendant's] petitioning activities no more than our rules of professional conduct or standards of practice already do").

*Pyankovska* also observed that the Wiretap Act unambiguously creates liability for litigation misconduct. "The Wiretap Act prohibits in no uncertain terms the interception, disclosure, or use in court of oral communications obtained in violation of the Act." 65 F.4th at 1078. Because the statute was clear, "there [wa]s no work for *Noerr-Pennington* and the canon of constitutional avoidance to do." *Id.* at 1078 n.5.

### 2. The litigation misconduct unambiguously prohibited by RICO is not protected by the Petition Clause.

a. In RICO—like the Wiretap Act—Congress unambiguously created liability for those who engage in litigation misconduct. Many of RICO's predicate acts relate to litigation. *See Living Designs*, 431 F.3d at 364-365 (rejecting argument

24

that "party's litigation conduct in a prior case is entitled to absolute immunity and cannot form the basis of a subsequent federal civil RICO claim" because "the RICO statute, itself, provides that conduct relating to prior litigation may constitute racketeering activity"). The obstruction-of-justice predicate, 18 U.S.C. § 1503, *requires* litigation activity because the defendant must have acted "with an intent to influence judicial or grand jury proceedings." *United States v. Aguilar*, 515 U.S. 593, 599-600 (1995); *see also* 18 U.S.C. § 1961(1)(B). The witness tampering and retaliation predicates, 18 U.S.C. §§ 1512, 1513, likewise necessarily involve litigation because they apply only to "official proceeding[s]," such as proceedings before a "judge," "Congress," or "a Federal Government agency." 18 U.S.C. § 1515(a)(1); *see also* 18 U.S.C. § 1961(1)(B). RICO also encompasses "any offense involving fraud connected with" Chapter 11 bankruptcy—again, a judicial proceeding. 18 U.S.C. § 1961(1)(D).

Courts therefore regularly apply RICO to litigation conduct. The mail and wire fraud predicates, 18 U.S.C. §§ 1341, 1343, have been successfully used to prosecute RICO claims against law firm personnel engaged in fraudulent personal injury litigation. *See, e.g.*, *United States v. Eisen*, 974 F.2d 246, 251-254 (2d Cir. 1992); *see also* 18 U.S.C. § 1961(1)(B). And the obstruction-of-justice predicate has been used in RICO claims arising from perjury, spoliation, witness intimidation, and bribing and blackmail of judges. *See, e.g.*, *United States v. Maloney*, 71 F.3d

25

645, 649-650 (7th Cir. 1995); *Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 792 F.2d 341, 344 & n.4, 353-355 (3d Cir. 1986). In none of these prosecutions have courts deemed a *Noerr-Pennington* analysis necessary or appropriate.

That is because, also like the Wiretap Act, such RICO claims do not raise constitutional concerns. "The First Amendment does not protect fraud," *San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1239 (9th Cir. 1997), or "preclude liability for false statements," *Clipper Exxpress*, 690 F.2d at 1261. And perjury "lack[s] First Amendment protection," "not simply because perjured statements are false," but also because "[p]erjured testimony 'is at war with justice' " since "it can cause a court to render a 'judgment not resting on truth' " and thereby "undermines the function and province of the law and threatens the integrity of judgments." *United States v. Alvarez*, 567 U.S. 709, 720-721 (2012) (plurality opinion); *see Clipper Exxpress*, 690 F.2d at 1261 ("[c]ourts uniformly punish perjury").

The same logic that removes *Noerr-Pennington* from criminal prosecutions applies *a fortiori* to civil claims like those in Ford's complaint. Indeed, it would make no sense to impose higher constraints on liability in the civil than criminal context, where constitutional safeguards are at their apex. "[T]he standards of certainty in statutes punishing for offenses is higher than in those depending primarily on civil action for enforcement." *Maldonado v. Morales*, 556 F.3d 1037,

26

1045 (9th Cir. 2009) (citation omitted). Unlike the Sherman Act, whose ambiguous text has required courts to adopt narrowing constructions, *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 687-688, Congress was clear about RICO's broad scope, and courts have concluded that the statute should be construed liberally, *see Odom*, 486 F.3d at 547.

b. The District Court concluded that *Noerr-Pennington* must be applicable to RICO based on *Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006). But that case cannot support application of the doctrine here.

In *Sosa*, DIRECTV disseminated thousands of demand letters accusing recipients of illegally accessing DIRECTV's satellite signal and threatening suit absent quick settlement. 437 F.3d at 925-927. Recipients filed a class action asserting RICO violations based on extortion and mail and wire fraud predicates. *Id.* at 927.

The Court concluded those predicates did not reach DIRECTV's settlement demands. *Id.* at 939-942. As to mail and wire fraud, DIRECTV's demand letters allegedly contained only (a) misrepresentations of law and (b) misrepresentations of fact about which the sender knew the recipient would not be deceived. *See id.* at 941. "It is well established, however, that misrepresentations of the law are not actionable as fraud." *Id.* at 940. And a factual misrepresentation "cannot amount to … fraud … where the sender knows the recipient will not be deceived by the falsehoods." *Id.* at 941.

That analysis is entirely consistent with Ford's argument here: that *Noerr-Pennington* does not apply to a properly pleaded RICO claim based on litigation misconduct like fraud and perjury knowingly undertaken to deceive because such activity raises no "substantial question" under the Petition Clause. *Sosa*, 437 F.3d at 932. "[M]isrepresentations (in the adjudicatory process) are not normal and legitimate exercises of the right to petition, and activities of this sort have been held beyond the protection of *Noerr*." *Feld Entm't Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 307 (D.D.C. 2012) (citation omitted). *Sosa* never considered that threshold question. *See Sosa*, 437 F.3d at 938 (recognizing that "First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute," but declining to address the issue because the plaintiff "declined to argue" it) (quoting *California Motor*, 404 U.S. at 514).

If anything, *Sosa* recognized RICO's general applicability to litigation misconduct notwithstanding *Noerr-Pennington*. Despite its holding as to the particular facts of that case, *Sosa* acknowledged that the Ninth Circuit had previously allowed RICO claims based on litigation misconduct. *Id.* at 940 (citing *Living Designs*, 431 F.3d at 365); *see Living Designs*, 431 F.3d at 364-365 (rejecting argument that "party's litigation conduct in a prior case is entitled to absolute

28

immunity" because "the RICO statute, itself, provides that conduct relating to prior litigation may constitute racketeering activity").

In short, it makes no sense to apply *Noerr-Pennington* to RICO claims for litigation misconduct. *Noerr-Pennington* is a narrowing construction premised on the assumption that Congress does not intend ambiguous statutes to reach conduct that might be protected under the Petition Clause. RICO unambiguously applies to litigation misconduct. A narrowing construction cannot delete statutory text. And the litigation misconduct prohibited by RICO is not protected by the Petition Clause.

**B.    The *Noerr-Pennington* Doctrine Is Inapplicable Under This Court's Three-Step Analysis.**

The most straightforward approach is to hold *Noerr-Pennington* inapplicable to Ford's RICO claims because RICO unambiguously applies to litigation misconduct and does not implicate the Petition Clause in doing so. Defendants' arguments, however, also flunk the "three step" *Noerr-Pennington* test this Court applied in *Sosa*. 437 F.3d at 930. At step one, courts consider "whether the lawsuit imposes a burden on petitioning rights." *Pyankovska*, 65 F.4th at 1077 (citation omitted). At step two, courts consider "whether the alleged activities constitute protected petitioning activity." *Id*. (citation omitted). At step three, courts consider "whether the statute at issue may be construed to avoid [the] burden" on petitioning rights. *Id*. (citation and alteration omitted).

29

*Noerr-Pennington* immunizes Defendants' conduct *only if* "the answer at *each* step is 'yes.' " *Id*. (citation omitted). If the answer to *any* question is "no," *Noerr-Pennington* does not apply. None of Ford's allegations satisfy any of the doctrine's three requirements, so the District Court erred thrice over in applying the doctrine to bar Ford's claims.

**1. Ford's lawsuit does not burden Defendants' petitioning rights because there is no petitioning right to flout the rules of litigation.**

a. *Noerr-Pennington* immunizes a defendant from liability only if the case's success would burden the defendant's "petitioning rights." *Pyankovska*, 65 F.4th at 1077 (citation omitted). This lawsuit does not. Ford does not seek to prevent Defendants from filing or prosecuting Song-Beverly claims or seeking attorney fees through non-perjurious, non-fabricated evidence. Ford's success would incentivize Defendants "to play by the rules applicable to all litigants," *id*., but that is not a burden on petitioning rights. "Federal and state rules limit in enumerable ways what litigants can say and do." *Id*. Defendants' right to file and prosecute Song-Beverly claims does not include a right to violate those rules when later seeking fees after the claims are resolved. The Petition Clause does not grant Defendants a right to defraud an opposing party or "to support" motions "with illegal evidence." *Id*.

This follows from *Pyankovska*. There, the ex-husband's attorney "was free to file and argue the custody motion—*i.e.*, to petition—but he was not free to support

30

that motion with illegal evidence." *Id*. at 1077. The plaintiff's contentions to the contrary faced "insurmountable hurdles under step one" because holding an attorney accountable for violating the Wiretap Act is no different than holding an attorney accountable for violating "the Federal Rules of Civil Procedure and Evidence." *Id*. "In other words, because [the defendant] had no petitioning 'right' to use the transcripts in the first place, requiring him to face the consequences specified by Congress for those who violated the law is not a cognizable 'burden' on any conduct he was lawfully entitled to participate in." *Id*. at 1078.

The same logic applies here. Ford seeks only to hold Defendants accountable for fraudulent evidence consisting of fabricated timesheets and perjured declarations submitted in support of out-of-court fee demands[2] and in-court fee motions, 2-ER-220-221—*i.e.*, for flouting "the rules applicable to all litigants," *Pyankovska*, 65 F.4th at 1077. That poses no burden on petitioning rights because Defendants had no right under the Petition Clause to commit fraud and perjury. Defendants "were entitled to participate and did participate in petitioning activity" via Song-Beverly litigation. *Id*. Indeed, as the complaint alleges, *see, e.g.*, 2-ER-206-213, Defendants

---

[2] In the Tenth Circuit, the absence of court involvement would preclude application of *Noerr-Pennington*. *See Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 893 (10th Cir. 2000) (en banc). This Court's *Sosa* decision expressly diverges from *Cardtoons* to hold that *Noerr-Pennington* applies to prelitigation demand letters. 437 F.3d at 937-938. Ford hereby preserves its argument that the Tenth Circuit has the better view. *See* 2-ER-110 n.2.

31

filed fee motions, supported by evidence, and received fee awards. *See Pyankovska*, 65 F.4th at 1077 (explaining the defendant could not "credibly" argue "that the litigation of the custody motion was 'burdened' " since he submitted the evidence to the court). "Once they were in [federal or] state court," however, the Defendants "were not at liberty to set their own rules." *Id.* Among the most basic rules applicable to all litigants are obligations not to lie and not to submit false evidence. *See e.g.*, 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1621 (perjury); Cal. Penal Code § 118 (perjury); Cal. R. Pro. Conduct 3.3(a)(1), (3) (prohibiting lawyers from knowingly making false statements or offering false evidence). Ford's lawsuit burdens only Defendants' failure to follow these rules that bind every other litigant.

b. The District Court's contrary holding inflates the " 'breathing space required' for the effective exercise of petitioning rights," *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 645 (9th Cir. 2009) (quoting *Sosa*, 437 F.3d at 933), to the point of bursting the generally-applicable legal rules that make effective litigation possible. The court held that Ford's lawsuit burdens petitioning rights simply because it seeks to impose liability for "representations that Defendants make to courts." 1-ER-14. That holding rests on two errors. *First*, the District Court's attempts to distinguish *Pyankovska* fail. That case controls. The court stated that the Enterprise's perjured declarations and fraudulent timesheets were petitioning activity, while the *Pyankovska* ex-husband's use of secret recordings was not. 1-

32

ER-43; 1-ER-16; *supra* p. 23. That is wrong. The transcripts in *Pyankovska* were submitted "to the state court on the public docket as exhibits to [the ex-husband's] declaration in support of his countermotion to modify the custody arrangement." 65 F.4th at 1072. Defendants' perjured declarations and fabricated timesheets, similarly, were filed in support of fee motions. *See* 2-ER-206-209, 2-ER-211-213. Both were "documents [or] pleadings, in which plaintiffs or defendants make representations and present arguments to support their request that the court do or not do something." *Pyankovska*, 65 F.4th at 1077 (quoting *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005)).

*Second*, the District Court, overreading *Freeman*'s enumeration of what "*can be described as petitions*," erred by treating all litigation-related petitioning activity, including unlawful activity, as if it burdened petitioning rights. 1-ER-14 (emphasis added) (quoting *Freeman*, 410 F.3d at 1184). But *Freeman* never addressed whether a lawsuit based on misrepresentations and perjury in court burdened a protected petitioning right. *See* 410 F.3d at 1183-85 (assessing whether conduct was a "petition" and amounted to a sham, without addressing whether it burdened petitioning rights). Not every "representation[]" and "argument[]" to a court, *Freeman*, 410 F.3d at 1184, is *protected* petitioning. That is why *Pyankovska* could hold that a Wiretap Act lawsuit against an attorney for submitting unlawful evidence in support of a motion did not burden protected petitioning rights. 65 F.4th at 1077-

33

78; *see also Yatvin*, 840 F.2d at 420 (rejecting the "extreme position" that "every legal pleading, however humble, comes trailing clouds of First Amendment glory") (Posner, J.).

The District Court also purported to rely on *Sosa* and *Kearney*, but misread them in a way that creates conflict with *Pyankovska*. *Sosa* and *Kearney* stand for the limited principle that "[t]he constitutional right to petition includes the right of *access* to the courts" and therefore extends to "most litigation activities" necessary to file and prosecute a claim. *United States v. Koziol*, 993 F.3d 1160, 1171 (9th Cir. 2021) (emphasis added). Neither purports to immunize the *litigation misconduct* addressed in *Pyankovska*—*i.e.*, submission of unlawful evidence in support of court motions.

In *Sosa*, for example, this Court held that the plaintiffs' RICO suit satisfied step one because "impos[ing] RICO liability on DIRECTV for sending the demand letters" would "burden DIRECTV's ability to settle legal claims short of filing a lawsuit." 437 F.3d at 932. "[R]estrictions on presuit demand letters … *could impair the right of access to the courts*" given that such letters "permit[] parties to frame their legal positions, often streamlining any subsequent litigation, and thereby reducing legal costs and facilitating access to the courts." *Id*. at 936 (emphasis added). And as discussed, *supra* pp. 27-29, the plaintiffs had failed to demonstrate

34

anything unlawful about the demand letters themselves—the letters did not violate "the rules applicable to all litigants." *Pyankovska*, 65 F.4th at 1077.

*Kearney* likewise understood step one to ask whether success of the case would burden the defendant's ability to prosecute a future claim. The plaintiff in *Kearney* filed a RICO suit against a school district's representative and attorneys alleging fraud and spoliation based on concealment of evidence and intentional misrepresentations as to her property's true value in an earlier eminent domain proceeding brought by the district. 590 F.3d at 641. This Court held the challenge to "discovery communications, interactions with expert witnesses and contractors, and statements to the court" would, if successful, "place[] a burden *on [the school district's] ability to bring*" eminent domain proceedings. *Id*. at 645 (emphasis added). *Kearney*, unlike *Pyankovska*, therefore did not have occasion to address the situation where a lawsuit poses no threat to the defendant's ability to initiate or prosecute claims but would burden only the submission of unlawful, fraudulent evidence in those proceedings.

The District Court therefore erred in framing the question as whether a successful lawsuit would burden "representations that Defendants make to courts." 1-ER-14. The court should have asked whether success "would *completely prevent* Defendants from engaging in their petitioning activities." *Embry*, 29 F.4th at 535 (emphasis added); *accord Sosa*, 437 F.3d at 932, 936; *Kearney*, 590 F.3d at 645.

35

The answer here is an emphatic "no." Ford's suit would not burden Mikhov's, Kirnos's, Morse's, or the Enterprise's ability to bring Song-Beverly suits or seek fees. Neither fraudulent timesheets nor perjured declarations are necessary for stating or prosecuting a claim or seeking fees "based on actual time expended." Cal. Civ. Code § 1794(d).

This Court can and should end the three-step analysis here. Because Ford's suit does not burden petitioning rights, the *Noerr-Pennington* doctrine does not bar Ford's claims. "Accordingly, [the Court] need not analyze steps two and three." *Pyankovska*, 65 F.4th at 1078.

### 2. The Enterprise's fraudulent scheme is not protected petitioning activity.

Even assuming that holding Defendants accountable for the Enterprise's fraud and perjury would burden petitioning rights (it wouldn't), *Noerr-Pennington* would still be inapplicable because Defendants also fail at step two. At step two, courts ask whether the petitioning conduct giving rise to the suit is itself constitutionally protected. *Id.* at 1077. Otherwise-qualifying litigation activity falls outside the *Noerr-Pennington* doctrine at this step if the activity is a "sham." *Kearney*, 590 F.3d at 644. The Petition Clause does not "protect[] sham petitions, and statutes need not be construed to permit them." *Sosa*, 437 F.3d at 932.

This Court has "identified three circumstances in which the sham exception might apply in the litigation context." *Embry*, 29 F.4th at 537-538. All three are

36

present here, and each independently renders the *Noerr-Pennington* doctrine inapplicable.

a. **The first sham exception applies.**  The first circumstance that brings claims within the ambit of the sham exception is "where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful." *Sosa*, 437 F.3d at 938.  In the antitrust context, this exception examines "whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor through the use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) (internal quotation marks, citations, and alteration omitted).  A successful lawsuit thus precludes the first sham exception for antitrust claims.  *Id.* at 60 n.5.

But this exception works differently for RICO claims.  "[T]he *Noerr-Pennington* doctrine and its sham exception arose in the antitrust context, and so the sham-exception principles discuss whether petitioning is done for an anticompetitive purpose or to interfere with a competitor's business relationships." *Embry*, 29 F.4th at 536.  Because those concerns are "inapt in non-antitrust contexts" like RICO, the Court must use "analogous standards suitable to each case's context." *Id.*  In the RICO fraud context, the question is whether the particular litigation conduct was "objectively baseless" and done with the "subjective intent to use legal process to

37

achieve the evil prohibited by the [fraud] statute." *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078-79 & n.6 (9th Cir. 2004).

In *Theofel*, plaintiffs filed claims under electronic privacy and computer fraud statutes against an attorney and his client for using a "patently unlawful" subpoena to gain access to e-mail stored by the plaintiffs' Internet service provider. *Id*. at 1071-72. The defendants argued *Noerr-Pennington* barred the suit because their subpoena was incidental to litigation. *Id*. at 1078. This Court disagreed, holding *Noerr-Pennington* inapplicable under the first sham exception because the subpoena was "objectively baseless." *Id*. at 1079 (citation omitted).

In finding the first sham exception applied, this Court rejected the defendants' argument that the Court should determine objective baselessness by looking "at the merits of the underlying litigation, not at the subpoena." *Id*. In the litigation-fraud context, a litigant does not "have immunity for any and all discovery abuses so long as his lawsuit has some merit." *Id*.; *accord Sosa*, 437 F.3d at 938 (confirming that litigation conduct "may fall within the sham exception where *either* the conduct itself *or* the underlying petition meets [the] sham litigation test" (citations omitted)). And the subjective prong is met in the fraud context by "proof of subjective intent to use legal process to achieve the evil prohibited by the [fraud] statute," which was satisfied there by the inference that "the purpose of *any* objectively baseless subpoena is to uncover private information." *Theofel*, 359 F.3d at 1079 n.6.

38

The first sham exception applies here for the same reasons. Defendants do not—indeed, they cannot—dispute that their fraudulent timesheets and perjured declarations were objectively baseless. If the fraud had been uncovered in time, Ford would have rejected the fee demands, and courts would have rejected the fabricated timesheets and perjured declarations. *Cf.* 2-ER-194 ("Defendants intended that Ford rely, and Ford did reasonably rely, on Defendants' fraudulent billings in paying false and fabricated fees"); 2-ER-189, 2-ER-206-213 (listing fees awarded by courts in reliance on perjured declarations and fabricated time entries). That the underlying Song-Beverly claims might have had some merit is irrelevant. A litigant does not receive "immunity for any and all [litigation] abuses so long as his lawsuit has some merit." *Theofel*, 359 F.3d at 1079.

Unlike *Theofel*, the Court need not rely on a presumption to find the subjective prong satisfied as well. *Compare id.* at 1079 n.6 ("presum[ing] the purpose of *any* objectively baseless subpoena is to uncover private information"). Ford has offered detailed allegations that Defendants' "subjective intent [was] to use legal process to achieve the evil prohibited by the statute." *Id.*; *see, e.g.*, 2-ER-219 ("Defendants intended that automakers and courts in various jurisdiction rely on Defendants' false and misleading statements, trusting Defendants to comply with their ethical obligations"); 2-ER-202-203, 2-ER-217. The *Noerr-Pennington* defense fails under the first sham exception.

39

The District Court appeared to reach a contrary conclusion based on *Kottle v. Northwest Kidney Centers*, 146 F.3d 1056 (9th Cir. 1998). 1-ER-17-20. But *Kottle* does not support the outcome below. In *Kottle*, a physician applied to a state agency for approval to build kidney dialysis centers in a particular county. 146 F.3d at 1058. The defendant, the only provider of those services in the county, then made false statements and misrepresentations about the entire proceeding—*i.e.*, "the need for kidney dialysis services" in that county—which influenced the agency to reject the applications. *Id. Kottle*'s sham-exception analysis therefore focused on whether the defendant's misrepresentations "deprived the entire [agency] proceeding of its legitimacy." *Id.* at 1063. *Kottle* did not preclude application of the sham exception for misconduct short of the entire litigation, and Ninth Circuit law is to the contrary. *See, e.g.*, *Theofel*, 359 F.3d at 1079.

b. **The second sham exception applies.** The second circumstance that brings claims within the sham exception applies where the defendant's wrongdoing consists of "bringing a whole series of legal proceedings." *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 811 (9th Cir. 1994). "[T]he filing of a whole series of lawsuits and other legal actions without regard to the merits has far more serious implications than filing a single action, and can serve as a very effective restraint on trade." *Id.* Ford's allegations show it can also serve as a very lucrative racketeering enterprise.

40

In the antitrust context, the second exception asks whether lawsuits are brought "pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." *Id.* Because concerns about harming a market rival are, again, "inapt in non-antitrust contexts" like RICO claims, the "analogous standard[]" here, *Embry*, 29 F.4th at 536, is whether the Enterprise brought serial suits to further its fraud. *See Theofel*, 359 F.3d at 1079 (applying sham exception to fraud context by homing in on the evil targeted by the fraud statute).

It did. The Enterprise utilized a litigation-mill model reflecting its primary goal of generating fraudulent attorney fee demands, which "often far exceeded— sometimes by a factor of 10—the amount in dispute in the underlying [Song-Beverly] case." 2-ER-202. The Enterprise filed thousands of cases hoping some would prove meritorious and create an opportunity to pursue objectively baseless (because fabricated) fee requests. *See* 2-ER-205.

Ford's allegations are an especially good fit for the second exception because Ford's RICO claims arise not from any one case but from a scheme carried out over thousands of cases. Indeed, "bringing a whole series of legal proceedings," *USS-POSCO*, 31 F.3d at 811, was integral to the Enterprise's strategy: the fraud was "ingeniously spread … across thousands of cases against many auto manufacturers so that [it] would go undetected." 2-ER-179-180. The second exception is designed

41

to exclude exactly that kind of systemic abuse of the court system from *Noerr-Pennington* immunity.

c. **The third sham exception applies.** The third sham litigation exception applies where "a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy." *Sosa*, 437 F.3d at 938 (quoting *Kottle*, 146 F.3d at 1060). This sham exception applies here because the Enterprise's "knowing fraud upon, or its intentional misrepresentations to" Ford and California courts facilitated the systematic extraction of inflated attorney fee awards, thereby depriving "the litigation of its legitimacy." *Kottle*, 146 F.3d at 1060 (citation omitted). As Ford's complaint explained, Enterprise attorneys, "despite being officers of the court, routinely corrupted the integrity of the judicial process by intentionally operating a fraud on every court in which they appeared bearing their fraudulent fee statements and perjured declarations." 2-ER-185.

Application of this exception follows directly from *Kearney* and *Sosa*. *Kearney* deemed *Noerr-Pennington* inapplicable to the plaintiff's claims under the third exception because the defendants' "intentional misrepresentations to the court, and fraud upon the court through the suppression of evidence … ultimately led to [the plaintiff's] property being valued lower than it should have been." 590 F.3d at 646-647. *Kearney* relied on *Sosa*, which described unlawful inducement of a lower-than-deserved recovery as the paradigm of litigation deprived of legitimacy. *Id*; *see*

42

*also Sosa*, 437 F.3d at 940 (holding the third sham exception would apply to "fraudulent discovery conduct … that induced the plaintiffs to settle the suit for a lower amount than they would have in the absence of the fraud").

Ford's allegations fit comfortably within this precedent—here, the Enterprise's misconduct produced an undeserved monetary award. The fraudulent fee demands and perjured declarations induced auto manufacturers including Ford to "settle … for a [greater] amount than they would have in the absence of the fraud," *Sosa*, 437 F.3d at 940, and induced courts to value Defendants' services "[higher] than [they] should have been," *Kearney*, 590 F.3d at 646-647.

The District Court's contrary holding takes an erroneously narrow view of what "deprive[s] … litigation of … legitimacy." *Kottle*, 146 F.3d at 1060 (citation omitted). Because Ford does not contest the prevailing party status of the Enterprise's clients or the Enterprise's entitlement to fees *if* supported by evidence of time actually expended and reasonably incurred, the court concluded that the misconduct here did not deprive "the *whole* [Song-Beverly] litigation of its validity," and refused to apply the third exception. 1-ER-19 (emphasis added).

That is wrong. This Court's precedent forecloses the argument that "a litigant should have [*Noerr-Pennington*] immunity for any and all [litigation] abuses so long as his lawsuit has some merit." *Theofel*, 359 F.3d at 1079; *see also Sosa*, 437 F.3d at 938 (applying this rule to all three sham exceptions). The District Court tried to

43

distinguish *Theofel* because the entity subject to allegedly abusive discovery there "was a third party," such that "as to that party, the subpoena was the entire proceeding." 1-ER-18-19. But that elides *Theofel*'s clear holding rejecting entirely the "implausible proposition" that courts should "look only at the merits of the underlying litigation." 359 F.3d at 1079.

The District Court's reasoning also conflicts with *Sosa* and *Kearney*. *Sosa* contemplated the third exception's application to fraudulent discovery conduct producing a lowball settlement. 437 F.3d at 940. But the Court did not require the *entire* settlement to be illegitimate. *Id.* It sufficed that wrongdoing "induced the plaintiffs to settle the suit for a lower amount than they would have in the absence of the fraud." *Id.* Analogizing to the discovery context, *Sosa* explained "that private discovery conduct, not itself a petition, may fall within the sham exception where *either* the conduct itself, *or* the underlying petition, meets [the] sham litigation test." *Id.* at 938 (emphases added and citations omitted). *Kearney* cited *Sosa* to apply the third exception to just such a situation—without questioning the underlying eminent domain proceedings' legitimacy, the court held that the intentional misrepresentations to the court and suppression of evidence there fell within the third exception because these activities caused the plaintiff's property to be "valued lower than it should have been." *Kearney*, 590 F.3d at 646-647. So too here. The

44

Enterprise's misrepresentations deprived its Song-Beverly litigation of legitimacy because they led to Ford paying higher legal fees than it should have paid.

In addition to creating conflict with *Sosa* and *Kearney*, adoption of the District Court's approach would break with other circuits' application of the third sham exception. Like *Sosa* and *Kearney*, other circuits require only that a defendant's knowing misrepresentation "was material, in the sense that it actually altered the outcome of the proceeding." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 843 (7th Cir. 2011) (citing consistent authority from the Third, Fourth, and Sixth circuits). The Enterprise's fraud and perjury was material here because it altered the outcome of its pursuit of attorney fees, whether in settlement or in a fee motion.

The District Court also erred in reasoning that, because Ford could not discern the fraud until it eventually could compile timesheets and declarations collected from many cases, the windfall in each individual case must have been "insignificant." 1-ER-20. But neither *Sosa* nor *Kearney* places a floor on the dollar amount that must be stolen to trigger the third exception. Indeed, construing these cases to impose such a requirement would wrongly allow attorneys to lie to courts and opposing parties without fear of consequences as long as their lies were minor and they could hide their misconduct until the case was over.

45

Even if there were a "significance" requirement, Ford has met it. Ford has alleged $100 million in damages. 2-ER-189-190, 2-ER-222. Even spread across the many cases in the Enterprise's racketeering scheme, that number could not be reached without significantly misrepresenting the value of attorney services in individual cases. Ford's well-pleaded allegation is that "the great majority of Ford's payments to [the Enterprise], in which Defendants shared, were attributed to fraudulent time records … made up years after the fact." 2-ER-194.

The *Noerr-Pennington* doctrine is thus inapplicable under the third sham exception.

### 3. RICO's fraud and obstruction predicates cannot be construed to exclude the Enterprise's fraud and perjury.

Defendants' *Noerr-Pennington* invocation fails for a third, independent reason: they cannot satisfy step three, which asks "whether the statute at issue may be construed to avoid" the specific conduct alleged. *Pyankovska*, 65 F.4th at 1077 (citation and alteration omitted). When evaluating *Noerr-Pennington*'s application to RICO claims under step three, this Court looks "to the particular RICO predicates alleged … to determine whether" they "reach the conduct at issue." *Sosa*, 437 F.3d at 939. Ford alleged mail and wire fraud and obstruction of justice based on Defendants' use of fabricated timesheets and perjured declarations. 2-ER-184-185, 2-ER-221. None of these predicates can be construed to avoid the Enterprise's misconduct.

46

a. At the outset, Defendants did not address step three below, as was their burden in establishing the *Noerr-Pennington* affirmative defense, until their reply brief. *See* 2-ER-119 (noting Defendants' failure to address step three). Defendants' invocation of *Noerr-Pennington* fails on that basis alone. As discussed, to secure dismissal at this early stage Defendants were required to show that *all three steps* of this Court's three-part *Noerr-Pennington* test are satisfied on the face of Ford's complaint. *Supra* pp. 16-17, 30.

b. Even if Defendants' failure to meet their burden on the affirmative defense could be excused, Ford's RICO claims unambiguously encompass Defendants' conduct. The first predicates on which Ford relies are mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. 2-ER-216, 2-ER-221; *see also* 18 U.S.C. § 1961(1)(B) (list of RICO predicates, including 18 U.S.C. §§ 1341 and 1343). Both statutes require a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341; *see also id.* § 1343. That language is interpreted broadly, *see Sosa*, 437 F.3d at 940 (citing *United States v. Louderman*, 576 F.2d 1383, 1388 (9th Cir. 1978)), and reaches litigation conduct, *see Living Designs*, 431 F.3d at 364-365.

The fraudulent timesheets here fall squarely within these statutes. Ford alleges that each Defendant participated in a scheme whereby the Enterprise stole "many millions of dollars from auto manufacturers through a pattern and practice of

47

false representations that were carried out by means of interstate wires and U.S. mail." 2-ER-181-182. These false representations were made both in settlement demands directly to Ford, *e.g.* 2-ER-190, and through fabricated timesheets filed in support of fee motions in court, 2-ER-206-213. Like the Wiretap Act in *Pyankovska*, the mail and wire fraud predicates are "pellucid, not ambiguous," 65 F.4th at 1078, in reaching the conduct alleged.

*Sosa* supports this conclusion. *Contra* 1-ER-21, 1-ER-50. As discussed, *supra* pp. 27-29, *Sosa* held that the mail and wire fraud statutes did not apply *in that case* because the plaintiffs had failed to allege a knowing misrepresentation of fact about which the plaintiffs did not already have personal knowledge. *See Sosa*, 437 F.3d at 940-942. Ford's allegations do not suffer from that flaw. The Enterprise's misrepresentations fall within what *Sosa* recognized to be the heartland of the mail and wire fraud predicates because they are factual and concerned matters not "fully within [Ford's] knowledge." *Id.* at 942. "Ford had no ability at the time of [the Enterprise's] fraudulent fee demands or the judicial proceedings that sometimes followed those demands to discover the fraud in each of thousands of cases[.]" 2-ER-184.

c. The other RICO predicate on which Ford relies is 18 U.S.C. § 1503, which prohibits obstruction of justice. 2-ER-216, 2-ER-221; *see also* 18 U.S.C. § 1961(1)(B) (list of RICO predicates, including 18 U.S.C. § 1503). Ford alleged

48

that "[i]n submitting sworn declarations [in federal litigation] in support of [the Enterprise's] fee motions, Defendants Mikhov and Kirnos repeatedly perjured themselves in violation of 18 U.S.C. § 1621, and thereby obstructed and impeded the administration of justice in violation of 18 U.S.C. § 1503." 2-ER-206; *see* 2-ER-180-188, 2-ER-193-194, 2-ER-209, 2-ER-216-218, 2-ER-220-221; *see also* 2-ER-112, 2-ER-119.

The obstruction statute "unambiguously applies to [Defendants'] conduct," *Pyankovska*, 65 F.4th at 1078, via the plain text of the perjury statute. "[A]cts of perjury are indictable under the obstruction of justice statute[.]" *Streck v. Peters*, 855 F. Supp. 1156, 1162 (D. Haw. 1994) (citing *United States v. Mayer*, 775 F.2d 1387, 1391 (9th Cir. 1985) (per curiam)). And "the RICO statute specifies that acts indictable under the obstruction of justice statute are RICO predicate acts, *see* 18 U.S.C. § 1961(1)(B)." *Id.*

To state the obvious, filing perjured declarations is perjury. A person is "guilty of perjury" where, "in any declaration … under penalty of perjury," the person "willfully subscribes as true any material matter which he does not believe to be true." 18 U.S.C. § 1621(2). That language "prohibits in no uncertain terms," *Pyankovska*, 65 F.4th at 1078, Mikhov's and Kirnos's knowingly false sworn declarations that "[a]ll time billing entries were completed contemporaneously with each dated entry or near in time to the work performed" and that they "personally

49

reviewed the billing entries to ensure that they appropriately reflect the time expended." 2-ER-206-207 (quoting 3-ER-522).

Indeed, courts have repeatedly held that false declarations filed in federal district court proceedings constitute obstruction of justice in violation of section 1503, or permitted prosecutions under that statute for this conduct. *See, e.g.*, *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 593-594 (S.D.N.Y. 2014) (holding attorney's conduct in drafting a misleading declaration and filing it with courts, with the purpose of preventing certain information from coming to light in a federal proceeding, fell "squarely within the federal obstruction of justice statute" and therefore served as a predicate act under RICO), *aff'd*, 833 F.3d 74, 132-134 (2d Cir. 2016); *Alix v. McKinsey & Co.*, No. 18-CV-4141 (JMF), 2023 WL 5344892, at *19 (S.D.N.Y. Aug. 18, 2023) (RICO claims predicated on obstruction of justice for false or misleading affidavits in bankruptcy proceedings); *United States v. Savoy*, 38 F. Supp. 2d 406, 408-410, 417 (D. Md. 1998) (obstruction prosecution for perjured declaration in federal civil case); *Streck*, 855 F. Supp. at 1162 (holding that the filing of a false declaration in a federal court can constitute obstruction of justice under section 1503 and therefore serve as a RICO predicate act); *United States v. Caron*, 551 F. Supp. 662, 670 (E.D. Va. 1982) (holding that the filing of a false declaration in a grand jury proceeding constitutes obstruction of justice in violation of section 1503), *aff'd*, 722 F.2d 739 (4th Cir. 1983) (table disposition); *see also United States*

50

*v. Gonzalez-Mares*, 752 F.2d 1485, 1491 (9th Cir. 1985) (citing *Caron* with approval).

The District Court held that Ford failed to make a cognizable step-three argument because the perjury statute is not listed among RICO's predicates, such that even if perjury unambiguously applies to the conduct alleged, that would not mean RICO unambiguously applies. *See* 1-ER-21. But, again, "perjury under 18 U.S.C. § 1621 constitutes a predicate act because acts of perjury are indictable under the obstruction of justice statute, 18 U.S.C. § 1503, and RICO specifies that acts indictable under that statute, where the alleged acts took place in federal court, qualify as predicate acts." *Presley v. Torrence*, No. 13-cv-5040, 2013 WL 3148342, at *4 (W.D. Wash. June 19, 2013); *accord Bunnett & Co. v. Gearheart*, No. 17-cv-01475-RS, 2018 WL 1070298, at *4 (N.D. Cal. Feb. 27, 2018) (explaining that because "acts of perjury committed in federal courts are properly indictable under" 18 U.S.C. § 1503, "these allegations may constitute predicate acts"); *C & W Constr. Co. v. Bhd. of Carpenters & Joiners of Am.*, 687 F. Supp. 1453, 1467 (D. Haw. 1988) (explaining that perjury can be a predicate act under RICO "through 18 U.S.C. § 1503, where the plaintiffs allege that the perjury was part of the pattern of a racketeering activity"); *Streck*, 855 F. Supp. at 1162.

The District Court faulted Ford for not expressly citing 18 U.S.C. § 1503 on the page of its brief discussing step three, suggesting Ford relied solely on the perjury

51

statute rather than the obstruction predicate as being met by Mikhov's and Kirnos's perjury. *See* 1-ER-21. But Ford's complaint clearly relied on the obstruction predicate, citing section 1503 many times: Ford alleged that "Mikhov's and Kirnos' perjury caused an obstruction of and impediment to justice in violation of 18 U.S.C. § 1503." 2-ER-209; *see* 2-ER-218 ("Defendants also engaged in multiple instances of perjury in federal court in violation of 18 U.S.C. § 1621, thereby 'corruptly … influencing, obstructing, and impeding … the due administration of justice[]' [in violation of] 18 U.S.C. § 1503" (brackets omitted); 2-ER-221 (pleading predicate act of "perjurious obstruction and impediment of justice in advancing the Enterprise's scheme in violation of 18 U.S.C. § 1503"); 2-ER-188, 2-ER-206, 2-ER-216 (also citing 18 U.S.C. § 1503)). And Ford's brief referenced these sections, explaining "that Defendants filed perjurious declarations in violation of 18 U.S.C. § 1621, *thereby obstructing and impeding the administration of justice*." 2-ER-119 (emphasis added).

Because the RICO predicates on which Ford relies cannot be construed to exclude the conduct alleged, Defendants' misplaced reliance on the *Noerr-Pennington* doctrine fails under the third step as well.

## II. THE DISTRICT COURT ERRED IN HOLDING THAT FORD'S RICO CLAIMS FAILED BECAUSE FORD DID NOT PLEAD A COMMON PURPOSE.

Ford adequately alleged that Defendants participated in a RICO enterprise. To do so, Ford needed to plausibly allege each Defendant participated in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.' " *Living Designs*, 431 F.3d at 361 (citation omitted). Ford did so, with detailed allegations that each Defendant—Mikhov, Kirnos, and Morse—associated with Knight Law Group as a legal-entity enterprise to deprive Ford of millions in unearned legal fees through mail and wire fraud and obstruction of justice.

Each Defendant participated in the Enterprise's use of fraudulent time and billing records that Enterprise attorneys used to make fee demands directly to auto manufacturers through interstate wires and mail. 2-ER-181-182, 2-ER-209-210. If a manufacturer acceded, it would send payment via interstate wires or mail. 2-ER-221 (citing 2-ER-255-271). If manufacturers refused, Mikhov or Kirnos filed fee motions using the federal courts' interstate e-filing system. *See* 2-ER-193-194, 2-ER-201-203, 2-ER-216. These motions were supported by sworn declarations, 2-ER-206, in which an Enterprise attorney obstructed justice by perjuriously attesting that "[a]ll time billing entries were completed contemporaneously with each dated entry or near in time to the work performed" and that the attorney "personally

53

reviewed the billing entries to ensure that they appropriately reflect the time expended." *Id*. (quoting 3-ER-522); *see also* 2-ER-207-209, 2-ER-211-213. If the court awarded fees, the manufacturer issued payment over interstate wires or mail. 2-ER-221 (citing 2-ER-255-271). These allegations meet RICO's elements.

The District Court identified a single purported factual deficiency in Ford's allegations concerning RICO's substantive elements: Ford's supposed failure to allege the "common purpose" needed for an *association-in-fact* enterprise. 1-ER-22-28. But Ford alleged a RICO violation by a distinct *legal-entity* enterprise—Knight Law Group, LLP. 2-ER-187-188, 2-ER-215-216; *see also* 2-ER-123. Unlike an association-in-fact enterprise, a legal-entity enterprise requires no common-purpose showing. And Ford adequately pleaded common purpose in any event.

### A. Because Ford Alleges A RICO Violation By A Legal-Entity Enterprise, Knight Law Group's Enterprise Status Is Established By Its Legal Existence.

Under RICO, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, *and* any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). This definition "describes two categories of associations": legal-entity enterprises and association-in-fact enterprises. *United States v. Turkette*, 452 U.S. 576, 581 (1981). "The first encompasses organizations such as corporations and

partnerships, and other 'legal entities[,]' " and "[t]he second covers 'any union or group of individuals associated in fact although not a legal entity.' " *Id.* at 581-582.

The standard for demonstrating either category is "not very demanding." *Odom*, 486 F.3d at 548; *see Boyle v. United States*, 556 U.S. 938, 944 (2009) (RICO's use of the "term 'any' ensures that the definition has a wide reach"). But the bar is especially low for legal-entity enterprises. *See First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) ("RICO requirements are most easily satisfied when the enterprise is a formal legal entity."). A "single 'partnership,' a single 'corporation,' a single 'association,' and a single 'other legal entity' are all enterprises"—period. *Odom*, 486 F.3d at 548. A RICO plaintiff pleading a legal-entity enterprise need only allege "the 'legal' existence of the corporation, partnership, or other legal form of organization charged." *United States v. Griffin*, 660 F.2d 996, 999 (4th Cir. 1981); *accord Bonner v. Henderson*, 147 F.3d 457, 459 (5th Cir. 1998) (per curiam) ("A legal entity [enterprise] is one that 'has sufficient existence in legal contemplation that it can function legally, be sued or sue and make decisions through agents as in the case of corporations.' " (quoting Black's Law Dictionary (6th ed. 1990)).

Ford satisfied that standard by alleging: "Defendants are a group of persons associated with Knight Law Group LLP, which constitutes an 'enterprise' within the meaning of 18 U.S.C. § 1961(4)." 2-ER-215-216.

The District Court ordered dismissal because, in its view, Ford failed to allege a "common purpose." 1-ER-22-28. Even if this were so (it is not), Ford was under no obligation to do so.

The District Court mistakenly applied the standard for an *association-in-fact* enterprise, which is an enterprise that lacks formal legal identity but nevertheless constitutes "a group of persons associated together for a common purpose of engaging in a course of conduct." *Turkette*, 452 U.S. at 583. Because such an enterprise lacks formal recognition, establishing its existence as an organized, continuing unit requires more detailed allegations. The plaintiff must allege "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946.

But none of that is necessary for a legal-entity enterprise. "Neither the actual nor ostensible purpose of such an enterprise" is relevant because its existence is established as a matter of law. *Griffin*, 660 F.2d at 999. Courts therefore "scrutinize RICO defendants' shared common purpose when an association-in-fact enterprise is alleged—not where, as here, the alleged enterprise is a legal entity separate from the defendants." *Cap. 7 Funding v. Wingfield Cap. Corp.*, No. 17-cv-2374, 2020 WL 2836757, at *9 (E.D.N.Y. May 29, 2020). The District Court erred by demanding a showing not required by law.

56

The District Court's concern about whether the Enterprise was engaged in "ordinary business conduct," 1-ER-23, 1-ER-25, reflects this same basic category error. The court cited cases analyzing the sufficiency of *association-in-fact* enterprise allegations and observing that two legally distinct entities do not form an association in fact merely by "enter[ing] into a commercial relationship to further their own separate business interests." *In re Arizona Theranos, Inc., Litig.*, 308 F. Supp. 3d 1026, 1060 (D. Ariz. 2018); *see* 1-ER-23 (citing *Theranos*, 308 F. Supp. 3d at 1060). Otherwise, a plaintiff could "transform a standard fraud claim into a RICO claim" by "construct[ing] a novel 'enterprise' out of nothing more than the allegation that [a] [p]rovider provides services to [the defendant]." *Gomez v. Guthy-Renker, LLC*, No. 14-cv-01425, 2015 WL 4270042, at *4-6 (C.D. Cal. July 13, 2015). To avoid such overextension of RICO, an association-in-fact enterprise must be supported by allegations of "a relationship more substantial than a routine contract between a service provider and its client." *Id*. at *11; *see also Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1057 (C.D. Cal. 2016) (allegations failed to support common purpose where they "only demonstrate that the parties 'are associated in a manner directly related to their own primary business activities' " (citation omitted)).

But, again, this concern has no application to a legal-entity enterprise. A legal-entity enterprise is precisely what RICO is designed to reach: RICO "protects

the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which unlawful activity is committed," including an employee's use of a corporation "as a vehicle" for racketeering activity. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164 (2001) (citation, internal quotation marks, and ellipses omitted). The use of RICO "against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct" is "inherent in the statute as written." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985).

> **B. Even If Ford Were Required To Plead A Common Purpose, The District Court's Dismissal Was Still Error Because Ford Adequately Did So.**

Although unnecessary, Ford's allegations show that "Defendants came together" not just for "an ordinary business purpose" like "bringing [Song-Beverly] cases" but also to "creat[e] fictitious billing records." 1-ER-23-24 (citation omitted); *see In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 980 (N.D. Cal. 2018) (holding allegations plausibly showed that defendants came together both "for the more general purpose of manufacturing and selling vehicles" *and* to commit acts of mail fraud by deceiving regulators into believing their vehicles complied with emissions standards). Ford explained that Defendants associated with the Enterprise "for the common purpose of advancing an ongoing criminal enterprise by creating and submitting fraudulent

58

billing records, including to Ford in settlement demands and to federal and state courts across California in fee petition proceedings, to obtain fraudulent payments for time never actually worked on behalf of clients." 2-ER-220.

Ford alleged, for instance, that each of the Defendants, who were "financially intertwined as partners," "oversaw the Enterprise's operations and expressly directed employees of the Enterprise to create fictitious fee statements and perjured declarations in order to allow the Enterprise to extract fraudulently induced payments from Ford and others." 2-ER-216. "Mikhov, Kirnos, Morse, and other attorneys and employees at [the Enterprise] work in tandem to conduct the operations of the enterprise, including by creating fictitious time sheets that misrepresent the tasks completed and the amount of time spent on cases, and regularly split the proceeds unlawfully by relying on these false and fraudulent billing records to obtain fee awards." 2-ER-187-188.

This is accomplished through Defendants' oversight of "a Fee Motion Department, made up of ten or more employees at any one time, whose primary task is to create fictitious billing records to support fee applications." *Id*. "At the direction of Defendants, members of the Fee Motion Department create time records in which they falsely add fictitious tasks, assign the amounts to be billed to the fictitious task, and choose a billing attorney to whom the fictitious task is to be attributed." *Id*.; *see also* 2-ER-179, 2-ER-194, 2-ER-216.

59

These allegations are supported by "testimony given in unrelated litigation" which "confirmed that [Enterprise] attorneys did not consistently record their time contemporaneously or ensure that the time entries ultimately attributed to them reflected time they actually worked" but instead "relied on the Fee Motion Department to generate false billing records to fraudulently recover unearned fees." 2-ER-191 (citing deposition transcripts). An employee in the Fee Motion Department testified that "team members were authorized to 'input an attorney task and identify a particular set of hours for that attorney,' " and did so "without confirming their accuracy with the lawyers whose time" was being generated after-the-fact (often *long* after-the-fact) by the Fee Motion Department. 2-ER-192-193.

The District Court accused Ford of relying too heavily on the "co-counsel[ing]" relationship. 1-ER-23 (quoting 1-ER-54). But Defendants are far more than co-counsel: Ford alleged they all play a leadership role in the legal-entity enterprise. 2-ER-185-187. And this was not the work of a single rogue employee. The Fee Motion Department involved ten or more employees divided into a multi-layered review system of drafters, reviewers, and finalizers. 2-ER-187-188, 2-ER-192-193. Together they fabricated entirely baseless billing entries using "guidelines" and "experience," 2-ER-192-193, "without ascertaining how much time [an attorney] spent on that task or whether he performed that task at all," 2-ER-200.

60

Nor can Defendants claim to have been ignorant of the Fee Motion Department's work. They specifically authorized the Fee Motion Department's practices. 2-ER-193 (citing sworn deposition testimony of Mikhov and Kirnos). Defendant Mikhov—the Enterprise's first managing partner—set up the Fee Motion Department "as a formal system to create fictitious time entries in [Song-Beverly] cases for work never performed or contemporaneously billed." 2-ER-185-186. And Mikhov "continues to manage" the scheme through a putative "management consulting company for hire." 2-ER-186. Some of the declarations Mikhov and Kirnos signed included *their own time* purportedly spent on cases. *E.g.*, 2-ER-208. And as managing partners of a small firm, 2-ER-178, 2-ER-191, 2-ER-193, they were aware of the money the firm was bringing in. Although firm management could plausibly decline to question a few high billers, it would be impossible to miss multiple attorneys working multiple 24+ hour days, or hundreds of hours in areas outside their purview.

Morse and others at the firm were likewise aware of and participated in the Enterprise's fraudulent scheme. Morse had an administrative and supervisory role at the firm. 2-ER-181, 2-ER-191-192, 2-ER-196-197. Even if Morse were not herself responsible for reviewing attorney billings, she and other firm management would have known that substantial revenue was coming into the Enterprise for tasks she never performed. *See supra* pp. 8-9.

In short, there is no "more plausible explanation," 1-ER-25, for Defendants' behavior other than a common purpose to defraud auto manufacturers like Ford out of tens of millions of dollars. Any contrary arguments should be directed to a jury.

## CONCLUSION

The Court should reverse and remand for further proceedings below.

Respectfully submitted,

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth
Jo-Ann Tamila Sagar
J. Andrew Mackenzie
HOGAN LOVELLS
  CADWALADER US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-8872
jessica.ellsworth@hlc.com

August 3, 2026

*Counsel for Ford Motor Company*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Ninth Circuit Rule 32-1 because it contains 13,972 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 in Times New Roman 14-point font.

August 3, 2026

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

**ADDENDUM**

# TABLE OF CONTENTS

Page

U.S. Const. amend. I ..................................................................................Add. 1

18 U.S.C. § 1341 .......................................................................................Add. 2

18 U.S.C. § 1343 .......................................................................................Add. 3

18 U.S.C. § 1503 .......................................................................................Add. 4

18 U.S.C. § 1621 .......................................................................................Add. 5

18 U.S.C. § 1961(1), (4) ...........................................................................Add. 6

i

## U.S. Const. amend. I

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

## 18 U.S.C. § 1341

### § 1341. Frauds and swindles

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

## 18 U.S.C. § 1343

### § 1343. Fraud by wire, radio, or television

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

## 18 U.S.C. § 1503

### § 1503. Influencing or injuring officer or juror generally

(a) Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b). If the offense under this section occurs in connection with a trial of a criminal case, and the act in violation of this section involves the threat of physical force or physical force, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case.

(b) The punishment for an offense under this section is--

(1) in the case of a killing, the punishment provided in sections 1111 and 1112;

(2) in the case of an attempted killing, or a case in which the offense was committed against a petit juror and in which a class A or B felony was charged, imprisonment for not more than 20 years, a fine under this title, or both; and

(3) in any other case, imprisonment for not more than 10 years, a fine under this title, or both.

## 18 U.S.C. § 1621

### § 1621. Perjury generally

Whoever--

**(1)** having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

**(2)** in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true;

is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.

**18 U.S.C. § 1961**

**§ 1961. Definitions**

As used in this chapter--

**(1)** "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 932 (relating to straw purchasing), section 933 (relating to trafficking in firearms), section 1028 (relating to fraud and related activity in connection with identification documents), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1351 (relating to fraud in foreign labor contracting), section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers), sections 1461-1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas, permits, and other documents), sections 1581-1592 (relating to peonage, slavery, and trafficking in persons)., 1 sections 1831 and 1832 (relating to economic espionage and theft of trade secrets), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956

Add. 6

(relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), section 1960 (relating to illegal money transmitters), sections 2251, 2251A, 2252, and 2260 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2318 (relating to trafficking in counterfeit labels for phonorecords, computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), section 2319 (relating to criminal infringement of a copyright), section 2319A (relating to unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances), section 2320 (relating to trafficking in goods or services bearing counterfeit marks), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341-2346 (relating to trafficking in contraband cigarettes), sections 2421-24 (relating to white slave traffic), sections 175-178 (relating to biological weapons), sections 229-229F (relating to chemical weapons), section 831 (relating to nuclear materials), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States, (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act, (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain, or (G) any act that is indictable under any provision listed in section 2332b(g)(5)(B);

\* \* \*

**(4)** "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

\* \* \*

Add. 7

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate ACMS system on August 3, 2026.  I certify that all participants in the case are registered users and that service will be accomplished by the Appellate ACMS system.

August 3, 2026

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth