**No. 26-2317**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

FORD MOTOR COMPANY,
*Plaintiff-Appellant,*

v.

STEVE MIKHOV, *et al.,*
*Defendants-Appellees*,

---

On Appeal from the United States District Court for the Central District of California, The Honorable Michelle Williams Court, United States District Judge, No. 2:25-cv-04550-MWC

---

# BRIEF OF AMICI CURIAE NATIONAL ASSOCIATION OF CONSUMER ADVOCATES, INC., CONSUMER FEDERATION OF CALIFORNIA, CONSUMER FEDERATION OF AMERICA, NATIONAL CONSUMERS LEAGUE, AND CENTER FOR AUTO SAFETY IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

---

Amanda J. Krause
Eric S. Zell (9th Circuit Admission Pending)
National Association of Consumer Advocates, Inc.
1629 K St NW, Suite 604
Washington, DC 20006
(202) 984-7706 ext. 113

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ........................................................................................1

INTEREST OF AMICI ..................................................................................3

ARGUMENT ..............................................................................................8

I. Defendants' post-litigation lawsuits against plaintiffs' attorneys will have a chilling effect on future litigation efforts. ...........................................8

II. Ford could have used well-established procedures in the underlying litigation to challenge the Knight Law Defendants' billing practices rather than filing a retaliatory RICO action. ..............................................9

III. Allowing retaliatory RICO lawsuits would ultimately harm consumers. ..12

CONCLUSION ..........................................................................................14

## TABLE OF AUTHORITIES

**Cases**

*Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973 (9th Cir. 2008)............................13

*Curtis & Assocs. v. Law Offices of David M. Bushman, Esq.*,
758 F. Supp. 2d 153 (E.D.N.Y. 2010)...................................................................13

*Engel v. CBS, Inc.*, 182 F.3d 124 (2d Cir. 1999)...................................................13

*Gabovitch v. Shear*, 70 F.3d 1252 (1st Cir. 1995)..................................................12

**Statutes**

15 U.S.C. § 1691n(a)(3)..........................................................................................12

15 U.S.C. § 1692k(a)(3)..........................................................................................12

15 U.S.C. § 1693m(a)(3).........................................................................................12

18 U.S.C. §§ 1961-1968 ............................................................................................1

Cal. Civil Code § 1790, *et seq.* ..................................................................................1

## INTRODUCTION

Plaintiff-Appellant Ford Motor Company has taken a remarkable approach in this case that is contrary to the way the American civil legal system operates. Defendants-Appellees' law firm, Knight Law Group, filed a series of successful lawsuits against Ford under California's Lemon Law, the Song-Beverly Consumer Warranty Act, Cal. Civil Code § 1790, *et seq*. Rather than accept its losses and adjust its business practices so as not to harm California consumers in the future (and avoid subsequent lawsuits), Ford chose to retaliate. It sued members of Knight Law (Knight Law Defendants) under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, alleging that Knight Law had a history of submitting inflated attorneys' fee billings in its fee petitions in the firm's cases against Ford.

Ford's lawsuit against the Knight Law Defendants converts the cost, burden, and risk of litigation into a weapon against attorneys who represented consumers asserting lawful (and successful) claims against it. If permitted, these suits would deter attorneys from agreeing to future representation and therefore reduce access to justice for consumers, raise the price of enforcement by sharply reducing the number of attorneys willing to file private actions, weaken private enforcement of statutory and common-law rights, and disrupt attorney-client relationships.

Regardless of whether Ford ultimately prevails in its challenge to the Knight Law Defendants' billing practices, this lawsuit has sent a message to the Knight Law Defendants and to any other plaintiff's attorney who sues Ford: if Ford loses a case, it can and will bring the weight of the civil justice system against them. The risk of a chilling effect is profound. Success for Ford in this case would draw a roadmap for other companies to retaliate against attorneys who have sued them and allow them to intimidate the plaintiff's bar into thinking twice before filing a lawsuit.

Importantly, Ford had other avenues to obtain the relief it seeks here that were better suited to achieve its purported goals. If Ford believed that the Knight Law Defendants engaged in improper billing practices, the proper venue to raise that concern was with the trial court that heard the parties' fee petition arguments. Instead, Ford filed a separate, retaliatory lawsuit.

As explained below, RICO suits like Ford's—even groundless ones—harm the civil justice system in at least three ways. First, they chill attorneys from taking on future cases against the same defendants. Second, they bypass remedies that already exist and are designed to address allegedly improper litigation conduct. Third, they ultimately harm consumers, who lose access to attorneys willing to enforce consumer protection laws. This Court should not permit Ford to manipulate the civil justice system in these ways and should affirm the district court's dismissal of Ford's claims.

## INTEREST OF AMICI

**1.** The National Association of Consumer Advocates, Inc. (NACA) is a nonprofit association of attorneys and consumer advocates dedicated to representing consumers against abusive and predatory business practices. NACA advocates for the rights of consumers and litigates cases to promote justice for consumers and to prevent deceptive, abusive, or unfair business practices. NACA and its members litigate cases across the country under federal and state consumer protection statutes, and NACA's members have represented hundreds of thousands of consumers in small-damages actions and consumer class actions. NACA's members regularly file lawsuits under statutes that include fee-shifting provisions and commonly submit fee petitions requesting an award of attorneys' fees at the conclusion of a successful case. NACA therefore has a direct interest in ensuring that attorneys who submit fee petitions in successful consumer cases are not exposed to retaliatory RICO suits for doing so. NACA also has an interest in ensuring that consumers are able to retain attorneys to represent them in consumer-protection lawsuits.

NACA offers this brief to provide the Court with an explanation of the impact of a defendant's post-litigation lawsuits challenging attorneys' litigation activity on the plaintiffs' bar as well as on consumers.

**2.** The Consumer Federation of California (CFC) is a nonprofit advocacy organization. Since 1960, CFC has been a powerful voice for consumer rights. CFC

campaigns for state and federal laws that place consumer protection ahead of corporate profit. Each year, CFC testifies before the California legislature on dozens of bills that affect millions of California's consumers. CFC also appears before state agencies in support of consumer regulations.

Some recent CFC legislative issues have included: protecting consumers' medical, financial, and digital privacy; strengthening campaign disclosure requirements for political contributions and advertisements; ensuring California's Made in USA label stays strong (truth in advertising); removing toxic chemicals from California furniture and insulation while maintaining fire safety and encouraging healthful building practices; and ensuring seniors understand reverse mortgages before signing contracts. Private enforcement of the laws CFC succeeds in getting enacted depends in large measure upon the ability of harmed consumers to obtain private legal counsel in order to assert their rights in a court of law. This case threatens that ability and therefore is a threat to bedrock principles for enforcing those laws and providing equal justice for all.

**3.** The Consumer Federation of America (CFA) is an association of non-profit consumer organizations that was established in 1968 to advance the consumer interest through research, advocacy, and education. Today, nearly 200 of these groups participate in the federation and govern it through their representatives on the organization's Board of Directors. As a research organization, CFA investigates

consumer issues, behavior, and attitudes through surveys, focus groups, investigative reports, economic analysis, and policy analysis. As an advocacy organization, CFA works to advance pro-consumer policies on a variety of issues before Congress, the White House, federal and state regulatory agencies, state legislatures, and the courts. We communicate and work with public officials to promote beneficial policies, oppose harmful ones, and ensure a balanced debate on issues important to consumers. As an education organization, CFA disseminates information on consumer issues to the public and news media, as well as to policymakers and other public interest advocates.

Since its founding, CFA has supported private enforcement of consumer protection laws and providing equal access to the courts, in order to vindicate the rights of those who have been harmed by illegal practices and help ensure compliance with vitally important laws that save lives, prevent injuries, and reduce the risks of economic losses. In specific high-impact cases, CFA has also served as a public-interest plaintiff in litigation, to fulfill the purposes of laws enacted to promote consumer protection, fair competition, and large-scale financial stability. The litigation now before the Court threatens to severely chill such enforcement, and therefore is a threat to the health, safety, and economic well-being of the American public.

**4.** The National Consumers League (NCL) is America's oldest consumer advocacy organization, dedicated to protecting and promoting social and economic justice for consumers and workers since 1899. Headquartered in Washington, DC, NCL is widely recognized as a leader in advocating for the health, safety, and economic viability of the American public, before Congress, regulatory agencies, state legislatures, in the media, and in coalitions with other non-profit pro-consumer organizations nationwide.

NCL provides government, businesses, and other organizations with the consumer's perspective on key issues, including child labor, privacy, food safety, and medication information. NCL leads several initiatives, including LifeSmarts, the Child Labor Coalition, Fraud.org, Script Your Future, Right2ObesityCare, and the Weight Truth, all working to empower and protect consumers in the marketplace and workplace. Since it was founded, NCL has played a pivotal role in winning passage of numerous landmark laws to improve protections for American consumers against illegal and predatory practices. NCL has a strong interest in ensuring that the public's voice is heard in the halls of justice, where those laws may be enforced. The current litigation before this court is a serious threat to the private enforcement of bedrock consumer protection laws that the public relies upon to keep themselves and their children and other family members safe.

**5.** The Center for Auto Safety (CAS) is a non-profit membership organization founded in 1970 to provide citizens a voice for automobile safety and quality in Washington D.C. Throughout its 56-year history, CAS has advocated for better consumer protections for car buyers, and played a key role in supporting passage of the federal lemon law, the Magnuson-Moss Act, and in the passage of lemon laws in every U.S. state and D.C. CAS published *The Lemon Book* and forty annual additions of *The Car Book* to assist consumers with problem vehicles, and educate consumers about their rights under state and federal lemon laws. CAS continues these efforts today via its website, podcast, newsletters, and social media. CAS also performs state-by-state rankings of vehicle lemon law provisions, to encourage consumers and policymakers to support improvements to state warranty laws. CAS joins in support of the defendant/appellee to ensure that consumers are able to access legal representation in lemon law and other automobile warranty disputes.

***

All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person other than amici or its counsel made a monetary contribution to its preparation or submission.

# ARGUMENT

## I. Defendants' post-litigation lawsuits against plaintiffs' attorneys will have a chilling effect on future litigation efforts.

A consumer's ability to bring a successful lawsuit against a company for violations of consumer protection laws almost always depends on that consumer having meaningful access to legal counsel. It is well established that parties proceeding *pro se* in litigation emerge victorious in only a vanishingly small percentage of cases. It is similarly true that a party is unlikely to prevail in a case when they are unable to secure representation by an attorney who is competent in the area of law that is the focus of the lawsuit.

A retaliatory RICO action burdens the targeted attorneys and would likely impact their willingness to engage in litigation that could result in a similar case being filed against them. The attorneys must bear the costs of defending the actions and dedicate time to them, respond to discovery into their litigation files, and manage the conflicts that can result from a post-litigation lawsuit that implicates the attorney-client relationship. These lawsuits may, in fact, drive a wedge between attorneys and their clients, either current or former, by creating disqualification pressures, interfering with privileged information, or shifting the focus away from the merits of the dispute between the client and the defendant and onto the retaliatory RICO action.

Faced with these possibilities, attorneys who are targeted by a post-litigation retaliatory RICO lawsuit will think twice before bringing another lawsuit against that same company (or a similar company), even if they believe a potential client has meritorious claims. If the attorneys are not intimidated out of filing such a case entirely, they may nevertheless discount the value of future cases to account for the prospect of another RICO lawsuit. These outcomes would force attorneys to reconsider their representation of consumers. Courts, and indeed the entire civil justice system, have a clear interest in avoiding a scenario in which collateral litigation becomes a leverage tool in the underlying action.

## II. Ford could have used well-established procedures in the underlying litigation to challenge the Knight Law Defendants' billing practices rather than filing a retaliatory RICO action.

One of the fundamental problems with lawsuits like the one Ford brought here is that they ignore the framework that already exists within the civil legal system to respond the allegations that Ford makes in its case. The Federal Rules of Civil Procedure already provide multiple avenues for litigants in Ford's position, and the Rules allow judges to address those concerns in ways that a RICO lawsuit does not. Ford should be required to utilize existing procedures, rather than wasting judicial resources by filing an entirely separate action.

Rule 11 of the Federal Rules of Civil Procedure and its state counterparts permit a court to award sanctions to address frivolous conduct or a filing that lacks

evidentiary support. Federal Rule 60 and its state counterparts allow parties to ask a court to provide relief from judgment in the face of misrepresentation or fraud. Federal Rule 37 and its state counterparts allow parties to seek sanctions for discovery misconduct, and courts maintain their inherent authority to sanction litigation conduct that is deemed to have been in bad faith. And, of course, when ruling on a motion for attorney's fees, courts can hear challenges from the party opposing the fee petition to evaluate whether the amount of the fees sought is reasonable.

These procedural tools let parties and courts respond to alleged litigation misconduct in a meaningful and efficient way: the allegedly aggrieved party can litigate its allegations and obtain appropriate remedies within the context of the underlying lawsuit. Courts regularly review attorney-fee petitions as a matter of course and make decisions on granting fees based on the information in those petitions. They also regularly respond to motions seeking sanctions and grant Rule 60 motions when the facts of the case warrant such action.

Here, had Ford raised its allegations directly in the cases that are now the subject of its RICO complaint, the matter of Knight Law Group's attorneys' fees would already have been finally resolved. Ford's challenges to Knight Law Group's fee petitions could have been handled more efficiently and with less impact on the civil justice system. The judges in the underlying cases, by virtue of their familiarity

with each lawsuit, were in a far better position to determine whether Knight Law Group's fee requests were reasonable in the context of each case.

When defendants file retaliatory RICO cases instead of availing themselves of these existing procedural tools, they threaten to reopen or relitigate cases that have already proceeded to final judgment. Here, Ford's retaliatory RICO action alleges improper billing practices by the Knight Law Defendants in a number of cases since 2015—in each of which Knight Law successfully represented clients against Ford. In every one of those cases, the court entered judgment in favor of the plaintiff, Knight Law submitted fee petitions to the court in connection with its request for an award of fees, and Ford had an opportunity to oppose the reasonableness and accuracy of those fees. If Ford believed there were inaccuracies in any of those fee petitions, the time to raise its claim was while the case was pending. What it is challenging now, long after the fact, is attorneys' fees that were statutorily authorized by an impartial judge.

Ford's RICO case therefore amounts to an out-of-time claim that the fees Knight Law accrued in its cases against Ford were fraudulent—even though a judge awarded those fees and thereby accepted their validity and reasonableness. To the extent Ford doubted the veracity of Knight Law's fee petition, it should have raised those concerns to the courts where the fee petitions were pending. If Ford's RICO complaint is allowed to proceed, it will create a significant risk of inconsistent

judgments. As the First Circuit held in affirming the dismissal of a similar retaliatory RICO action, "simply by alleging that defendants' litigation stance in the state court case was 'fraudulent,' plaintiff is insisting upon a right to relitigate that entire case in federal court …. The RICO statute obviously was not meant to endorse any such occurrence." *Gabovitch v. Shear*, 70 F.3d 1252, *3 (1st Cir. 1995). The proper time to litigate Knight Law's fees was during the cases in which those fees were incurred, not in a later RICO lawsuit.

## III. Allowing retaliatory RICO lawsuits would ultimately harm consumers.

If this Court countenances a RICO action in this instance, similar retaliatory cases will proliferate. And if that happens, fewer attorneys will be willing to file consumer-protection lawsuits in the future. Many consumer protection statutes permit fee-shifting to a prevailing plaintiff.[1] Lawyers representing consumers in these cases are often only financially able to do so because of the promise of an award of attorney's fees should they prevail—ordinary consumers are often financially unable to pay an attorney's hourly rate. Thus, as this Court has recognized, "[i]n order to encourage able counsel to undertake [consumer protection] cases, … it is necessary that counsel be awarded fees commensurate with

---

[1] *See*, *e.g.*, 15 U.S.C. § 1692k(a)(3) (fee shifting for successful claim under the Fair Debt Collection Practices Act); 15 U.S.C. § 1693m(a)(3) (same for successful claim under the Electronic Funds Transfer Act); 15 U.S.C. § 1691n(a)(3) (same for successful claim under the Fair Credit Reporting Act).

those which they could obtain by taking other types of cases." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 981 (9th Cir. 2008).

If Ford and other defendants in consumer protection actions are permitted to intimidate consumer lawyers out of filing cases, individual consumers will bear the brunt of the harm. The ability of consumers to bring cases that benefit the public will slowly evaporate. Allowing retaliatory RICO actions that focus on an attorney's conduct in a prior lawsuit would "chill litigants and lawyers and frustrate the well-established public policy goal of maintaining open access to the courts." *Curtis & Assocs. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 173 (E.D.N.Y. 2010) (citing *Engel v. CBS, Inc.*, 182 F.3d 124, 129 (2d Cir. 1999) (noting "strong public policy of open access to the courts for all parties and [need] to avoid ad infinitum [litigation] with each party claiming that the opponent's previous action was malicious and meritless")).

Regardless of whether Ford intended its retaliatory RICO lawsuit to deter Knight Law from representing consumers, allowing Ford's claims to proceed would have that chilling effect, and consumers would suffer the consequences. Given the strong public policy interest in allowing an open path for consumers to challenge corporate malfeasance, the Court should look skeptically at retaliatory RICO lawsuits in general and reject Ford's attempt to resuscitate its claims here.

## CONCLUSION

For the reasons set forth above and in the Knight Law Defendants' brief, this Court should affirm the District Court's order dismissing Ford's complaint.

November 23, 2026

Respectfully submitted,

/s/ *Amanda J. Krause*

Amanda J. Krause
Eric S. Zell (9th Circuit Admission Pending)
National Association of Consumer Advocates, Inc.
1629 K St NW, Suite 604
Washington, DC 20006
amanda@consumeradvocates.org
eric@consumeradvocates.org
(202) 984-7706 ext. 113

*Attorneys for Amici Curiae National Association of Consumer Advocates, Inc., Consumer Federation of California, Consumer Federation of America, National Consumers League, and Center for Auto Safety*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-2317

I am the attorney or self-represented party.

**This brief contains** 3,000 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated ______.
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Amanda Krause **Date** 11/23/2026

*(use "s/[typed name]" to sign electronically-filed documents)*